(March 19, 1912.)

## VIRGINIA A. HANES, Respondent, v. IDAHO IRRIGATION CO., LTD., Appellant.

[122 Pac. 859.]

DAMAGES—EX DELICTO—EX CONTRACTU—CAREY ACT OF CONGRESS—STATE LAWS—CONSTRUCTION OF—CONSTRUCTION COMPANY UNDER CAREY ACT—CONSTRUCTION OF IRRIGATION WORKS—OPERATING COMPANY—CONTROL OF—SETTLER—MEASURE OF DAMAGES—INSTRUCTIONS.

(Syllabus by the court.)

1. *Held,* that this is an action on contract and not in tort.

2. Under the Carey Act of Congress and the statutes of the state in regard thereto, a plan or scheme is provided for the reclamation of desert lands, and where a construction company has entered into a contract with the state to construct an irrigation system for the reclamation of certain lands, and has agreed to organize an operating company to which said system and the water connected therewith shall be transferred, to be held for the settlers upon the lands included within said system, and has also reserved the right to furnish water to settlers prior to the time that said system is transferred to the operating company, and the construction company notifies the settler that it will furnish water for an irrigation season beginning on the 1st of April, and the settler prepares his land and purchases fruit trees and sets them out on said land, and the company fails to furnish water in accordance with its contract, it is liable for the damages sustained by the settler.

3. Under the provisions of the settler's contract, it is provided that interest from April 1st, 1909, at six per cent per annum, may be charged on balance of purchase price if water is available from the canals of the company for use during the irrigation season of 1909, and if not available for that season, that interest shall commence when water is available.

4. It is provided in said settler's contract that the state agreement and the laws of Idaho are made a part of such contract and they shall be regarded as defining the rights of the respective parties.

5. That provision of the state contract which authorizes the irrigation company to charge and assess the purchasers of water rights in said system not to exceed thirty-five cents per acre per

season for each acre of land for which a water right has been purchased for maintenance purposes does not require the purchaser of a water right to pay such maintenance fee or charge until the same has been fixed by the company.

6. *Held,* under the provisions of said contract with the state that the construction company had the absolute control of the operating company at the time the damages sued for in this action occurred.

7. The construction company under the provisions of said contract with the state was authorized to operate said system prior to its being turned over to the operating company. *Held,* that if it undertook to do so and failed through its fault to furnish water as required by said contract, it was liable for damages to the settler in case he sustained any.

8. Under the provisions of sec. 1628, Rev. Codes, it is made the duty of a Carey Act irrigation company to notify the settler when water is ready for delivery, in order that the settler may improve his land and make the reclamation required in order to secure title from the state to his land.

9. The giving of such notice under the contract and law served to fix the time within which the settler must cultivate and reclaim his land, and also fixes the time, if water is furnished, when interest shall begin on deferred payments on his water contract, and it was the duty of the construction company to furnish the water after it had given the notice.

10. Under said state contract the construction company was required to supply water and an irrigation system.

11. *Held,* that in the operation of said canal and the furnishing of water the construction company was a *quasi*-public service corporation, and under the state contract the construction company was bound to construct its works in accordance with said contract, and damages resulting from a failure to do so may be recovered by the person injured, and if its system was constructed and it had water and had notified the settler that it was ready to deliver it and the settler was thereafter damaged by failure to get it, he may recover his damages.

12. *Held,* that the evidence is sufficient to sustain the verdict.

13. *Held,* that the instructions given by the court correctly stated the law.

14. The measure of damages for the destruction of apple trees for want of water, which have been planted and in a condition to grow, is what such destroyed trees were worth on the premises in their growing state at the time of the destruction, and in determining that question there may be taken into consideration the difference in the value of the land immediately before the trees were

planted and the value of the land after the trees were planted, which increased value results wholly by reason of the planting of the trees in a growing condition and not an increase in the value of the land occasioned by anything else.

APPEAL from the District Court of the Fourth Judicial District for Lincoln County. Hon. Edward A. Walters, Judge.

Action to recover damages for failure to deliver water. Judgment for plaintiff. *Affirmed.*

N. M. Ruick, and F. T. Disney, for Appellant.

Corporations which supply water to their own members only are agents merely of the stockholders, and are not liable for damages for a failure to deliver the water to which a shareholder may be entitled. (Wiel on Water Rights, 3d ed., sec. 1261.)

Neither the Big Wood River Reservoir and Canal Co., Ltd., nor the Idaho Irrigation Co., is the owner of the water right, but is the mere agent of the parties entitled to the use of the water. (*Slosser v. Salt River Valley Irr. Co.,* 7 Ariz. 376, 65 Pac. 332; *Shorb v. Beaudry,* 56 Cal. 446; *Chatter v. San Francisco S. R. Co.,* 19 Cal. 219.)

The private character of the Big Wood River Reservoir & Canal Co. is disclosed in clauses 9 and 11 of the state agreement. It is in no sense a public service corporation, but merely a private agency for the purpose of operating and maintaining the irrigation system during the period of construction and afterward, and for the purpose of levying and collecting tolls for such maintenance and operation. (Wiel on Water Rights, 3d ed., sec. 1266.)

The instruction of the lower court as to measure of damages savors of prospective profits which are never allowed in cases of this character. (*Crow v. San Joaquin & K. R. C. & I. Co.,* 130 Cal. 309, 62 Pac. 562, 1058; *Pallett v. Murphy,* 131 Cal. 192, 63 Pac. 366; *Northern Colo. Irr. Co. v. Richards,* 22 Colo. 450, 45 Pac. 423; *Wade v. Belmont Irr. Can. Co.,* 87

Neb. 732, 138 Am. St. 506, 128 N. W. 514, 31 L. R. A., N. S., 743, and note.)

R. V. Wilcox, A. M. Bowen, and Angel & Lamme, for Respondent.

Crops having been planted on the supposition,—warranted by the contract and notice,—that water would be available, which necessarily meant that the system would be properly constructed, the defendant was responsible for loss thereby, including the loss of the trees. (*Crowder v. McDonnell*, 21 Mont. 367, 54 Pac. 43; *Spencer v. Hamilton*, 113 N. C. 49, 37 Am. St. 611, 18 S. E. 167.)

Plaintiff is not a stockholder in the appellant company, but sues on a contract made with the appellant. The appellant is a corporation organized for profit, and, if it was under contractual duty to furnish water, could be sued directly for damages resulting from a failure on its part to do so. (*Candler v. Washoe Lake R. & G. Co.*, 28 Nev. 151, 6 Ann. Cas. 946, 80 Pac. 751; *Sample v. Fresno T. & I. Co.*, 129 Cal. 222, 61 Pac. 1085; *Smith v. Hicks*, 14 N. M. 560, 98 Pac. 138, 19 L. R. A., N. S., 938; *Watson v. Needham*, 161 Mass. 404, 37 N. E. 204, 24 L. R. A. 287; *Farr v. Griffith*, 9 Utah, 416, 35 Pac. 506.)

Respondent having planted her fruit trees on the faith of the notice that she would receive water, it became appellant's duty to furnish such water under her contract as stated in the notice, and appellant is now estopped from asserting a lack of duty on its part to make such delivery. (16 Cyc. 784 et seq.; *Davis v. Surety Co.*, 139 Cal. 223, 72 Pac. 1001; *City of Seattle v. Columbia etc. Ry. Co.*, 6 Wash. 379, 33 Pac. 1048; *Radford v. Gaskill*, 20 Mont. 293, 50 Pac. 854; *Hall v. Solomon*, 61 Conn. 476, 29 Am. St. 218, 23 Atl. 876.)

The only question is whether in an action on a contract for failure to deliver water the rule announced a proper measure of damages for destruction of trees in a growing state. The measure of damages is in all cases compensation, and "the inquiry must always be: What is an adequate remedy to the

party injured?''    (13 Cyc. 12, 34; Sutherland, Damages, sec. 45.)

The general rule is that the party injured by the breach of contract is entitled to recover all his damages, including gain prevented as well as losses sustained, provided they are certain, and such as might naturally be expected to follow the breach.    (*Hoge v. Norton,* 22 Kan. 374; *Hadley v. Box-endale,* 9 Ex. 341; *Wolcott v. Mount,* 36 N. J. L. 262, 13 Am. Rep. 438, 38 N. J. L. 496, 20 Am. Rep. 425; *Heilman v. Pruyn,* 122 Mich. 301, 80 Am. St. 570, 81 N. W. 97; *Dunn v. Bushnell,* 63 Neb. 568, 93 Am. St. 474, 88 N. W. 693; *White v. Miller,* 7 Hun (N. Y.), 427.)

In some cases the rental value of the land has been held to be the proper rule as to the measure of damages for destruction of fruit trees.    (*Montgomery v. Locks,* 72 Cal. 75, 13 Pac. 401; *Missouri K. & T. Ry. v. Lycan,* 57 Kan. 635, 47 Pac. 526; *Kansas City etc. Ry. v. Perry,* 65 Kan. 792, 70 Pac. 876; *Atchison etc. Ry. Co. v. Geiser,* 68 Kan. 281, 1 Ann. Cas. 812, 75 Pac. 68; *Mongollon G. & C. Co. v. Stout,* 14 N. M. 245, 91 Pac. 724; *Rowe v. C. & N. Ry. Co.,* 102 Iowa, 286, 71 N. W. 409; *Dwight v. Elmira etc. R. R. Co.,* 132 N. Y. 199, 28 Am. St. 563, 30 N. E. 398, 15 L. R. A. 612; *Evans v. Gas Co.,* 148 N. Y. 112, 51 Am. St. 681, 42 N. E. 513, 30 L. R. A. 651; *White v. Chicago etc. Ry. Co.,* 1 S. D. 326, 47 N. W. 146, 9 L. R. A. 824; *Bailey v. Chicago etc. Ry. Co.,* 3 S. D. 531, 54 N. W. 596, 19 L. R. A. 653.)

The measure is the damage to the inheritance by loss of fruit and shade trees.    (*Mitchell v. Billingsly,* 17 Ala. 391; *White v. Stoner,* 18 Mo. App. 540; *Nixon v. Stillwell,* 52 Hun, 353, 5 N. Y. Supp. 248; *Hoyt v. Telegraph Co.,* 60 Conn. 386. 22 Atl. 957; *Carner v. Chicago etc. R. R. Co.,* 43 Minn. 375, 45 N. W. 713; *Missouri K. & T. Ry. Co. v. Steinberger,* 6 Kan. App. 585, 51 Pac. 623.)

S. H. Hays, *Amicus Curiae.*

''A tort in the legal sense consists in the violation of a duty imposed by the general law upon all persons occupying the relation which is involved in any given transaction.''

(Andrews' American Law, 2d ed., sec. 653; Wyman, Public Service Corp., sec. 335.)

An irrigation district is a public or municipal corporation, between which and the water users there is no contractual relation. (*Snake River Valley Irr. Dist. v. Stevens,* 18 Ida. 541, 110 Pac. 1033.)

Such a corporation is liable in tort for breach of its public duty, that public duty being to properly administer its trust, distribute the water and keep the works in repair.

The Carey Act operating company, like an irrigation district, is organized by law under the authority of the state to cover a certain locality and to serve the land owners within a certain district, and is a *quasi*-public corporation. (Thompson, Corporations, secs. 25, 32, 33.)

Where the specific thing (like water) whose continued existence is essential to the performance is exhausted without the fault of the promisor, he is excused. (Benjamin, Contracts, p. 330; *Ward v. Vance,* 93 Pa. 499; *Ontario D. F. G. Assn. v. Cutting Co.,* 134 Cal. 21, 86 Am. St. 231, 66 Pac. 28, 53 L. R. A. 681.)

SULLIVAN, J.—This is an action to recover damages for the loss of certain fruit trees set out on the lands of plaintiff and the loss alleged to have occurred by reason of a failure of the defendant company to furnish water for the irrigation of said trees, as provided by contract.

The appellant corporation is engaged in the construction and operation of a system of canals and irrigation works in Lincoln county, for the reclamation of a large tract of land under the Carey Act, having entered into a contract with the state land board for that purpose on August 1, 1907. The respondent is a purchaser and holder of a water right contract from the appellant, and brings her suit against appellant for damages resulting from a failure on the part of appellant to fulfill the obligations of its contract with her. It appears from her complaint that she purchased a water right from appellant on January 29, 1909, for the irrigation of forty acres of Carey Act land, then entered by her under the state

law.   She pleads her contract of purchase and the contract between the state land board and the irrigation company, according to their legal effect, and alleges that on the 15th of March, 1909, she was notified by appellant that water would be ready for her land under her said contract for the irrigation season of 1909, which season opened April 1st, and relying thereon, she planted 2,700 apple trees; that she was unable to secure water to irrigate said trees and by reason thereof her trees were destroyed; that if she had been able to secure the amount of water contemplated by her contract, her trees would have lived and thrived.   She prays for damages in the sum of $1,500.

The answer of the defendant corporation admits the making of the contract with the state and with the plaintiff, and attaches a copy of each contract as a part of said answer, and avers that those contracts constitute the sole and only contracts existing between the state and the defendant and between the defendant and plaintiff relating to water for said forty acre tract of land; admits that the defendant corporation is in possession, ownership and control of the irrigation works constructed and to be constructed under said contract with the state, subject to the rights of the entryman, and is also in possession and control of the majority of the shares of the Big Wood River Reservoir & Canal Co., Ltd., and in actual control of the last-named company, in pursuance of the provisions of said state contract; admits that on or about March 15, 1909, it notified plaintiff that water would be available for the irrigation of said lands of plaintiff for the irrigation season of 1909, a copy of which notice is attached to said answer; denies that the plaintiff notified the defendant corporation that she desired the use of said water for her lands for said season of 1909, or that she intended to cultivate said lands or set out an orchard thereon; and denies, on information and belief, the setting out of said trees and that the defendant failed to keep said irrigation system in repair or that plaintiff was unable to procure water for her lands, and denies that the defendant corporation, under the terms of said contracts and notice, or either of them, was under obligations or re-

quired to furnish water to plaintiff for the irrigation season of 1909, and denies that the plaintiff has complied with the terms. of her said agreement or offered to comply therewith, or paid or offered to pay or tendered the amount of the annual maintenance which is required by the terms of said contracts; and avers that the plaintiff entirely failed to make the payment denominated the "first deferred payment" or any payment, as provided for in said contracts as a condition upon which water was to be supplied to entrymen under said irrigation system. It also denies that proper care and attention were given to said trees or that the same would have lived under the most favorable conditions of water supply, and alleges that if any trees were planted the same were inferior in growth and quality, and did not possess sufficient life to live and thrive, and that proper care was not taken in planting the same; denies that the destruction of said trees was due to the failure of said defendant to deliver sufficient water for the irrigation of the same, and that plaintiff has suffered any damages by reason of the acts of appellant.

Upon the issues made by the pleadings, the case was tried by a jury, which returned a verdict in favor of the plaintiff for $900. A motion for a new trial was denied, and this appeal is from the order denying the new trial and from the judgment.

(1) It is conceded by counsel for both parties that the plaintiff seeks to recover in this action upon a breach of contract to deliver water, and the trial court proceeded in the trial of the case upon the theory that it was an action on contract; but counsel who appears as a friend of the court contends that this is an action in tort and not on contract. The allegations of the complaint charge a breach of said contracts in three particulars: 1. Failure to keep the irrigation system in proper repair and condition; 2. Failure to construct its system so that water would be available therefrom, as contemplated by the contract; 3. Failure to make water available. The contract, among other things, was for the delivery of water to the respondent upon notice by appellant, and it is clear that under the allegations of the complaint and denials

and averments of the answer this was intended as an action on the contract and not one in tort.

It is stated by the text-writers and courts that they have been unable to find any accurate and perfect definition of a tort. It is said that between actions plainly *ex contractu* and those as clearly *ex delicto* there exists what has been termed a borderland, where lines of distinction are shadowy and obscure and the tort and the contract so approach each other and become so nearly coincident as to make their practical separation somewhat difficult. (38 Cyc. 415; Moak's Underhill on Torts, p. 23.) A tort has been defined as the infringement of a right created otherwise than by contract; and again: A wrong independent of contract. (38 Cyc. 415, and notes.) In the case at bar the plaintiff by contract agreed to deliver certain water to the respondent at a certain time, which time was to be determined by written notice. The water was not delivered. The violation was clearly that of contract under the allegations of the complaint, and the failure to deliver water was not a wrong independent of the contract but a wrong in violation of it.

(2) The decision of this case depends largely upon the proper construction of a contract made by the state of Idaho, through the state board of land commissioners, with the Idaho Irrigation Company, and a contract of the Idaho Irrigation Company with respondent, under what is known as the Carey Act of Congress and the laws of this state. We shall hereafter, for convenience, refer to the state board of land commissioners as the "state," the Idaho Irrigation Company as the "irrigation company," the agreement between the state and said irrigation company as the "state agreement" and the Big Wood River Reservoir & Canal Co., Ltd., as the "operating company," and to the plaintiff as the respondent or settler, and the agreement between the plaintiff and the irrigation company as the "settler's agreement."

The act of Congress known as the Carey Act, approved August 18, 1894 (28 Stat. U. S. 372–422), provided a scheme for the reclamation of certain desert lands of the public domain, whereby it was proposed to patent to the several states

named therein such desert land as each state might cause to be irrigated, reclaimed, occupied, cultivated and actually settled upon. By an amendment to said act, passed in 1897, a lien or liens were authorized to be created by the state against the land reclaimed, for the actual cost and necessary expense of reclamation and reasonable interest thereon. Said act was amended again by Congress by an act approved March 3, 1901 (31 Stat. U. S. 1133), fixing the date at which the time shall begin to run for the ten-year period given for the reclamation of such lands. The legislature of the state of Idaho, at its third session, accepted said grant of Congress and supplemented the congressional act by legislation which enables the state to make selections of such desert lands as are susceptible of reclamation, and provides for the reclamation, settlement and disposal of the same. The selection, management and disposal of such lands are vested in the state board of land commissioners, who are authorized to make such rules and regulations as may be necessary in order to carry out the purposes of the law. The state law provides means whereby irrigation works may be constructed for the reclamation of such lands by any individual, association or company under the supervision of the state. Any such party desiring to take advantage of the provisions of said law is required to file a proposal with the state board of land commissioners, asking for a withdrawal from the public domain of the lands which it is desired to reclaim. This proposal must describe the source of the water supply, the lands to be reclaimed and the works by which it is proposed to reclaim the same; also an estimate of the cost of the same and the price at which water rights will be sold to those who settle upon the lands. Such proposal must be accompanied by proper maps, plans and estimates. The law provides that such proposals shall not be approved by the board unless they first meet the approval of the state engineer, who must examine and report fully to the board upon all that relates to said matter. (See sec. 1613, Rev. Codes, et seq.) If the proposal is favorably received by the board, application will be made to the Secretary of the Interior by the state for the

segregation from the public domain of the lands described in such application. As soon as such lands shall have been permanently withdrawn from the operation of the public land laws of the United States and placed under the supervision of the Carey Act, the state will enter into a contract with the parties who desire to construct the irrigation works referred to. The company entering into such contract with the state is related to the undertaking simply as a "construction company" (see Rules and Regulations State Board of Land Commrs., 1909, p. 6), whose duty it will be, under the provisions of the state law and terms of the contract, to build a canal, the money spent in such construction being secured by the land which the canal is designed to irrigate. The irrigation works when completed, and the water connected therewith, will be sold to the settlers who enter the land, at a price agreed upon by the construction company and the state. Before the settler may enter the land, however, he must contract to purchase a share in such works and water for each and every acre of land which he desires to enter, each share representing a certain carrying capacity in the canal system, which in every case must be sufficient to deliver the water required for the irrigation of the land. The plan adopted for the administration of the irrigation works while in possession of the construction company, the system for the distribution of water from the canal to the users, and all contracts entered into between the company and the owner of the land must meet the approval of the state, and under the supervision of the state such works are within the absolute control of the construction company until the system is transferred to the operating company.

Under said act of Congress and the amendments thereto and the laws of the state of Idaho, said irrigation company filed its proposal with the state land board as required by the state law, on July 24, 1906. With said application was filed list No. 9, including a little over forty thousand acres of land; list No. 10, filed October 1, 1906, which included about 55,000 acres of land; and list No. 11, filed January 5, 1907, including a little over 12,000 acres of land, asking for the

withdrawal of the lands described in said application and lists. Said proposal was thereafter amended pursuant to an application filed with said board on January 5, 1907, and other lists of land were thereafter filed. It is conceded that said proposal was in compliance with said law and contained the information required in such proposals, and was accompanied by proper maps, plans and estimates. After the state engineer had made his report, as required by law, to the state board, said proposal was favorably received by the board and application was made to the Secretary of the Interior by the state for the segregation from the public domain of the lands described in said proposal and lists, and when said lands were permanently withdrawn from the operation of the public land laws, the state entered into the said contract designated as the "state agreement" with said irrigation company, on August 21, 1907, and the irrigation company is named therein as the party of the second part, and agreed with the state "to construct a dam, reservoir and irrigation system hereinafter referred to and described and to provide for the sale of shares or water rights in said reservoir and irrigation system from time to time as and in the manner hereinafter provided, to persons filing upon portions of the lands hereinbefore described and referred to; also to supply water from said irrigation system to the owners of other lands and not described herein, but which are susceptible of irrigation from this system; such shares or water rights to be sold on the terms hereinafter specified, and finally to provide the manner of transferring the ownership, management and control of said irrigation system to the purchasers of said shares or water rights, as hereinafter provided."

Then follow certain specifications for the construction of said system, the cost of which is estimated to be about two millions of dollars "and upward, which includes the estimate of cost of distributing laterals and sublaterals to each 160 acre tract for the whole 110,000 acres, as hereinafter provided." Then follow the dimensions of the canals.

It is also provided that "Changes may be made in these specifications from time to time by agreement between the

state engineer, the state land board and the said second party, such changes, however, not to impair the efficiency or durability of the works for the purposes for which they are intended.'' It is also provided that the main canals in this system shall have a carrying capacity, when completed, sufficient to deliver simultaneously one second-foot of water for every eighty acres of land described in the contract, together with all other lands susceptible of irrigation from said canal.

It is conceded that the irrigation company owns a right to divert from Big Wood river and Malad river 3,000 cubic feet per second of time of water. It is also provided as follows: ''When the actual construction of said canals and irrigation works shall have been inaugurated and so far completed as to insure that the said water will be furnished the hereinafter described lands, the said board of land commissioners may in their discretion cause to be opened for settlement, by advertisement as provided by law, such portions of said tract as they deem advisable, in every case the opening to be under such regulations as to the manner of said opening as shall be prescribed by the state board of land commissioners.''

It will be observed that this provision of the contract is a very wise one, both for the irrigation company and for the state and the settler, as it prohibits the sale of any of the lands included within such segregation until ''the actual construction of said canals and irrigation works shall have been inaugurated and so far completed as to insure that the said water will be furnished the hereinafter described lands.'' The irrigation company was anxious, no doubt, to make a sale of its water rights at as early a date as possible, thereby getting the first payment on such water rights, and it·was intended on the part of the state to permit no lands to be sold until the irrigation system had been completed so far as to insure water for the lands sold to the settler.

Under said ''state agreement,'' the irrigation company agreed to supply water to the lands included in said list No. 9 on or before May 8, 1908, and to the lands included in lists Nos. 10, 11 and 12 within two years from the date of the contract. The land involved in this controversy is included ·

in said list No. 11, and pursuant to said state agreement the irrigation company proceeded with the construction of said works and entered into an agreement with the respondent Hanes on January 29, 1909, whereby it sold to her forty shares of the capital stock of the Big Wood River Reservoir & Canal Co., which company was organized as provided by the state contract and is herein designated the "operating company." Said forty shares represented one-half of a cubic foot of water per second of time, to be used in the irrigation of respondent's said forty acre tract of land. The respondent agreed to pay for said shares of stock the sum of $1,400, $120 thereof being paid in cash, leaving a balance of $1,280 due and payable in annual instalments, commencing on January 29, 1910, when the first deferred instalment of $120, principal, and $63.57, interest, became due and payable. However, it is provided in the contract that interest from April 1, 1909, at six per cent per annum may be charged if water is available from said reservoir and canal for use during the irrigation season of 1909, and if not available for said season, interest shall commence when such water is available. It is further agreed that no payment other than the cash payment and no interest shall be required to be paid under said contract until the water is available for distribution at a point within one-half mile of each legal subdivision of 160 acres, and that such water must be available at the beginning of such irrigation season in order to make the first deferred payment become due that year; and it is provided that the payments shall be advanced in time according to the delay in the delivery of the water. It is also agreed that upon the default of any payment or interest thereon or any annual charge, toll or assessment for the operation and maintenance of the irrigation system, the company may declare the entire amount of the principal purchase price for such water rights due and may proceed to collect the same. The agreement adopts as a part thereof the agreement between the state and the irrigation company, also the laws of Idaho, and that these shall be regarded as defining the rights of the respective parties.

It is provided in the ninth subdivision of the state agreement as follows:

"It being necessary to provide a convenient method of transferring the ownership and control of said canal from the said party of the second part herein to the purchasers of said water rights in said canal and for determining their rights among themselves and between said purchasers and the party of the second part herein, for the purpose of operating and maintaining said canal during the period of construction and afterwards and for the purpose of levying and collecting tolls, charges and assessments for the carrying on and maintaining of said canal and the management and operation thereof, it is hereby provided that as soon as said lands are ordered thrown open for settlement, a corporation, to be known as the Big Wood River Reservoir and Canal Company, Limited, shall be formed at the expense of the party of the second part, the Articles of Incorporation of said company to be in a form approved by the Attorney-General of the State of Idaho; that the authorized capital stock of said corporation shall be One Hundred Twenty-five Thousand (125,000) shares, which amount is intended to represent one share for each acre of land which may hereafter be irrigated from said canal. The entire authorized amount of the capital stock of said corporation shall be delivered to the party of the second part herein in consideration of the covenants and agreements herein contained in order to enable it to deliver to purchasers of water rights the shares of stock representing the same. Said shares of stock, however, shall have no voting power and shall not have force and effect until they have been sold or contracted to be sold to purchasers of land under this irrigation system.

"At the time of the purchase of any water right there shall be issued to the purchaser thereof one share of the capital stock of said corporation for each acre of land entered or filed upon. That the said party of the second part herein shall, in case said water rights or shares of stock are not fully paid for, require the indorsement and delivery to it of said stock, and shall at the same time, require of said pur-

chaser an agreement that until thirty-five per cent. (35%) of the purchase price of said stock has been paid the said party of the second part herein shall vote said stock in such manner as it may deem proper at all meetings of the stockholders of said corporation.

"But the said second party hereto nor the Big Wood River Reservoir and Canal Company, Limited, cannot in any manner control any of the said system so as to limit the liability of the second party under the terms of this contract.

"The said Big Wood River Reservoir and Canal Company, Limited, shall have the management, ownership and control as above set out, of the said irrigation system as fast as the same is completed and turned over to it for operation by the said party of the second part, as hereinafter provided. Whenever it is certified by the Chief Engineer of the Company and the State Engineer that certain portions of the said irrigation system are completed for the purpose of operation, the same may, with the consent of the State Land Board be turned over to the said Big Wood River Reservoir and Canal Company, Limited, for operation. Such transfer and operation, however, shall not in any manner lessen the responsibility of the said second party with reference to the terms of this contract, nor shall such consent upon the part of the State Land Board be construed as a final acceptance of such portion of such canal, it being always understood that the acceptance of said irrigation system must be in its entirety and that the bond given for the faithful performance of the said contract must be made and be liable for the substantial completion of the entire irrigation system."

It will be observed from those provisions that the irrigation company had the absolute control of the operating company and of everything connected therewith. And it is provided in the settler's agreement that the irrigation company "will cause said company (the operating company) to keep and maintain the said irrigation system in good order and condition and to cause any necessary repairs thereto to be made as soon as practicable and expedient," and it is provided in the state agreement that the operating company has power to

levy the necessary tolls, charges and assessments on all users of water in proportion to their respective holdings of stock, whether water is used or not, and the irrigation company agrees that no charges shall be made for the delivery of water until after the 1st of April, 1909, and that thereafter the maintenance shall not exceed thirty-five cents per acre so long as the ''irrigation company'' has control of the ''operating company.''

It is suggested that plaintiff is not entitled to recover in this action, for the reason that she did not tender on the first day of April said thirty-five cents per acre for maintenance fees. There is nothing in that contention, as under the provisions of said contract the company was authorized to charge and assess the purchasers of water rights in said system ''not to exceed the sum of thirty-five cents per acre for each acre of land for which a water right has been purchased, the same to become due at the beginning of each irrigation season.'' There is nothing in the record to show that the irrigation company had made any assessment whatever for maintenance purposes, and the plaintiff evidently did not know what such charges would be until the company had acted in that regard and fixed the charge per acre. Had the company fixed the charge per acre prior to the 1st of April and respondent had then refused to pay such charge, a different question would be presented. There is, therefore, nothing in that contention of the appellant. The interest and first deferred payment did not become due until January 29, 1910, and the respondent was not required to pay until they became due.

Under the provisions of the said 'state contract, the irrigation company had absolute control of said operating company at the time the damages sued for occurred. But it is contended by counsel for appellant that by the terms of the contract with the state the irrigation company was only a construction company and not an operating company, and that all liability and obligation assumed in the operation of the canal rests solely with the operating company, and that if there is any liability for damages to the plaintiff for the

failure to supply her with water, such liability attaches to the operating company and not to the irrigation company.

We are unable to agree with counsel in that contention. Under those contracts the operating company was as helpless as an infant at the time the damages sued for occurred. It did nothing and could do nothing, as it was absolutely dominated and controlled by the irrigation company. Everything was done by the irrigation company and not by the operating company. The irrigation company agreed to construct its system and furnish water to each purchaser of a water right within one-half mile of his land; and after notice to the settler that its system was ready to deliver water to him for an irrigation season and the irrigation company failed to deliver it, it is liable for whatever damages the settler sustained by reason of its failure to deliver water to him. The irrigation company ought to have known whether it could deliver water or not before it gave notice to the settler that it would deliver water, and it cannot now legally contend that the settler had no business to give any attention to the notice, and that if he were foolish enough to pay any attention to it and prepare to put in a crop, or did put in a crop and it failed because of the failure to furnish water, he must stand the loss. Such a holding would outrage justice and add insult to injury. The irrigation company was the one that caused the injury by giving the notice that it would deliver water, and such an injury is not *ad damnum absque injuria*. Under the provisions of said state agreement, it was agreed that neither the irrigation company nor the operating company could in any manner control any of said system of irrigation so as to limit the liability of the irrigation company under the terms of the contract. What was the necessity for a provision of that kind if the parties contemplated that the irrigation company should not be liable for any damages whatever caused by its negligence and carelessness and for violation of its said contract? That provision of the contract refers to the control of said system. The operating company was without any mind or legal responsibility or liability in the hands of the irrigation company, until the system

was turned over to it. That being true, when the irrigation company undertook to operate said canal it was liable for damages that might result from its neglect or failure to operate the system in accordance with said agreements. Under the contract, upon the giving of the notice the respondent, if she had not been ready to receive the water, for the irrigation season of 1909, would have had to pay maintenance charges, the interest upon the purchase price and the first deferred payment on the principal; and under the provisions of the contract and said notice she had a right to prepare her land for a crop or fruit trees and if the irrigation company failed to deliver water after notice, and she was thereby injured, she is entitled to recover any legal damages arising from the failure of the company to deliver the water.

It will be observed from the above quotations from the state agreement with the irrigation company, the operating company could not in any manner control any part of said system so as to limit the liability of the irrigation company under the terms of said contract, and the operating company had no authority to operate any portion of said system until the same had been turned over to it as provided in said contract, which had not been done at the time the damages sued for in this action occurred. There was nothing in the contract to prevent the irrigation company from operating the system prior to its being turned over to the operating company. In fact, it is clearly implied that it may do so, and it did evidently do so as shown by the record in this case, and since its operation of the system has resulted in an injury, it alone is responsible therefor. While it is true its time had not expired for the completion of the construction of said system at the time it notified respondent that it would furnish her water, that makes no difference so far as this case is concerned, for under the contract the irrigation company had the right to begin furnishing water to settlers before the completion of its system to lands which could be irrigated from the system so far as completed, and the settler was obliged to pay the tolls and charges for such water and the

first deferred payment on the purchase price and interest, whether he used the water or not. The irrigation company was clearly authorized to operate said system, so far as completed, prior to its being turned over to the operating company, and if it undertook to do so under the contract and after notice failed to furnish the water as required by said contract, it was clearly liable for damages to the settler in case he sustained any damages. It is admitted by the pleadings that the company had plenty of water in its reservoirs or at its dam. That being true, if the failure to deliver water was brought about by defect in the construction of the system, the company would be liable for damages. If the failure to deliver water was occasioned by what is termed "the act of God," a different rule would apply. It is now too late for the irrigation company to insist on a construction of said contract to the effect that it was not authorized to operate said canal. It retained control, possession and management of the system, and after having notified respondent that water would be ready for her land for the year 1909, it is now estopped by its own acts to deny that it was not authorized to do so. It no doubt gave such notice so that interest would begin on the deferred payments and to acquire the first annual deferred payment to be made. It would be a strange doctrine indeed to hold that the settler would be obliged to pay interest upon the receipt of said notice and the company not be obligated under the contract to deliver him the water.

Under the provisions of sec. 1628, Rev. Codes, it is made the duty of the irrigation company to notify the settler when water is ready for delivery in order that the settler may do his cultivating and make the reclamation required in order to secure title to his land. That must be done within a specified time after notice. When the settler receives such notice in accordance with the terms of the statute, he cannot delay but must proceed. If the irrigation company, being in control and possession of the system, is not liable under the contract, no one is, as the operating company has nothing to do with the matter. The settler would have no recourse against anyone, even though an abundance of water were

available, and it appears by the record in this case that an abundance of water was available. Such a contingency or condition was never contemplated, as clearly appears from the provisions of said contract.

Counsel for appellant contend in their brief that the giving of said notice amounted to nothing, as there was no provision in the contract requiring such notice to be given. The giving of notice was no doubt intended to have and did have a double effect: It gave the settler notice, thereby fixing the time within which he must cultivate and reclaim his land under the Carey Act and statute and thus enable him to procure title. It also had the effect of notifying the settler that interest on all deferred payments on his water contract would begin at the commencement of the next irrigation season, as provided in the contract. By giving said notice the irrigation company no doubt had the latter purpose in mind and desired to have interest begin as soon as possible. In any event, under the law the settler would not disregard the notice, for then he was required to proceed with his improvements in order to secure title to his land, and it placed him under obligation to pay interest and make a payment on the principal. As no part of the system had been turned over to the operating company at that time, it was not its duty to operate said system. It was clearly the duty under said contract of the irrigation company, after it gave notice, to furnish the water referred to in the notice. That duty arose under the contract and the law, which was made a part of said contract.

The facts summarized are as follows: (1) The irrigation company was in possession and control of the system; (2) It had plenty of water; (3) It was engaged in the operation of the system; (4) The plaintiff was entitled to water from the system; (5) The company was obliged to notify the settler when water would be available; (6) The settler was obliged by law to cultivate and reclaim his land within a specified time after notice; (7) The settler was obliged to pay interest on deferred payments after notice; (8) The

company notified the settler when water was ready for delivery; (9) Plaintiff, relying on notice, planted trees.

Under that state of facts and the contracts and the law which is made a part of the contract, there can be but one rational conclusion therefrom, and that is if the settler was injured by failure to deliver water, the irrigation company is liable.

Under the contract the irrigation company was required to supply two things: water and an irrigation system. It is conceded that it had the water and the system. If the irrigation company were at fault in the construction of its system, the operating company could not be held liable for that. As the settler's contract makes the state contract a part of the former and the state contract makes the law a part of its contract, the irrigation company contracts with the settler to the same effect, so far as he is concerned, as it does with the state. In the operation of said canal, said irrigation company was a *quasi*-public service corporation. Under the contract the irrigation company was bound to construct the works in accordance with the contract with the state, and damages resulting from a failure to do so may be recovered, and if its system was properly constructed and it had water and had notified the settler that it was ready to deliver it and the settler was thereafter damaged by failure to deliver, he may recover his damages.

As before stated, the record clearly shows that there was an ample supply of water at the place of diversion. That fact is admitted by the pleadings.

(3) As to the insufficiency of the evidence to sustain the verdict: Counsel for appellant in his brief, referring to the specification in regard to the insufficiency of the evidence, states as follows: "These specifications, grouped, may be included in the one specification that the evidence is insufficient to justify the verdict, in that it appears therefrom that the damage, if any, was not the result of insufficient water for irrigation, but was due to the negligence of the plaintiff."

Upon an examination of the specifications in regard to the insufficiency of the evidence, it is found that they relate to

(1) whether the loss was occasioned by lack of water; (2) whether the loss was occasioned by defective tree stock; (3) whether the loss was occasioned by failure on the part of plaintiff to properly protect trees from rabbits; and (4) whether the defendant was at fault.

The evidence shows that the trees in question were purchased in April, but, by reason of no water being available, were not planted until the fore part of June, at which time water was delivered in small quantities. It was the contention of respondent that had she at that time secured water as contemplated by her contract and said notice, the trees would have been set out and would have lived and thrived. The appellant, on the other hand, contends that the lateness of the season, together with the fact that the trees had been "heeled in" from April to June, would have prevented any of them from living. It is clear to the court that if the water had been furnished in April, the trees would have been put out and the most of them lived, and so far as the late planting of the trees is concerned, it appears that not sufficient water was furnished, and that there was a conflict in the evidence upon the question whether the late planting of the trees was the cause of their not growing. But it must be borne in mind that the respondent planted the trees as soon as she received water, and it was the fault of the appellant that water was not furnished her sooner. The jury must have considered the fact of the late planting of the trees and the cause of it, as the amount given by the verdict is considerably less than the damage shown by the evidence of plaintiff. It is contended that the trees were destroyed by rabbits and not on account of lack of water. Counsel for appellant appears to occupy two positions in this case: The first is that the trees were dead when put out or had been greatly injured by being kept so long "heeled in"; and the other is that they were destroyed by rabbits. If they were dead when planted, the rabbits certainly did not kill them thereafter. There was a conflict in the evidence upon that question and the jury passed upon it.

We think the evidence sufficient to sustain the verdict.

(4) It is next contended that the court erred in giving the following instruction to the jury:

"The court instructs the jury that if you find from the evidence that during the month of June, 1909, the plaintiff, relying upon the notice given by defendant, planted certain apple trees on the land described in the complaint, and you further find that such trees were planted at such time, in such manner and under such conditions that they would have grown and thrived had water been available therefor, and you further find that water was not available therefor as provided in the contracts, or sufficient water therefor, and that by reason of such lack of water such trees were destroyed, then the plaintiff would be entitled to recover at your hands damages for the loss of such trees."

It is contended that said instruction is erroneous for two reasons: First, it assumes that a contract was in existence between plaintiff and defendant whereby defendant obligated itself to make water available for plaintiff's use; second, it implies liability by reason of the notice given that the company would furnish the respondent water on April 1, 1909. Both of said contentions have in effect been heretofore decided in this opinion, wherein it is held that under the contracts and notice the appellant became liable to furnish water to the respondent for the irrigation season of 1909. Under the facts of this case said instruction is clearly the law, and the court did not err in giving it.

It is also contended that the court erred in giving the following instruction:

"The court instructs the jury that the measure of damages for destruction of apple trees planted and growing is what such destroyed trees were worth on the premises in their growing state, and the jury in determining this may consider the difference in the value of the land with and without such growing trees thereon at the time of destruction."

It is contended that said instruction savors of prospective profits, which it is contended are not allowed in cases of this character. That instruction was intended to fix the measure of damages at the added value of the land by reason of the

planting of said trees in a growing condition and not from an increased value occasioned by anything else. Under the facts of this case we are fully satified that the measure of damages as stated in said instruction is correct. Respondent was notified that the company would deliver her water on the 1st of April, 1909. She prepared her land for setting out fruit trees, purchased the trees and through the failure of the company to furnish her water was unable to set them out until the 9th of June, and the evidence on behalf of the plaintiff shows that if sufficient water had been furnished from that time on during the season, ninety per cent of the trees would have grown.

By the first instruction above quoted, the jury was instructed that if they found that such trees were planted at such time, in such manner and under such conditions that they would have grown and thrived had water been available therefor, and they further found that water was not available therefor, and by reason of lack of such water such trees were destroyed, then the plaintiff would be entitled to recover the damages for the loss of such trees. If the trees had not been set out under the conditions stated in said instruction but were set out at a time when it was known to the respondent that such trees would not grow, then a different rule for the measure of damages would obtain. (As bearing upon the measure of damages, see *Grisinger v. Hubbard, ante,* p. 469, 122 Pac. 853, decided at the January, 1912, term of this court. See, also, *Montgomery v. Locke,* 72 Cal. 75, 13 Pac. 401.)

Finding no reversible error in the record, the judgment must be affirmed, and it is so ordered. Costs of this appeal are awarded to the respondent.