### IN THE

# SUPREME COURT

#### OF THE

## STATE OF IDAHO.

---

(October 6, 1915.)

## DOLIN COLLINS, Respondent, v. TWIN FALLS NORTH SIDE LAND AND WATER COMPANY, Appellant.

[152 Pac. 200.]

CAREY ACT CONSTRUCTION CO.—STATE CONTRACT—IRRIGATION SYSTEM—WATER—FAILURE TO FURNISH—DAMAGE TO CROPS—MEASURE OF DAMAGES—SERVICE DITCH—FAILURE TO CONSTRUCT—CHECK OR DAM IN LATERAL OR SUBLATERAL—DUTY OF CONSTRUCTION COMPANY —OF SETTLER — ADMISSION OF EVIDENCE — SUFFICIENCY OF—INSTRUCTIONS.

1. Under the contract of the construction company with the state on a Carey Act project, the construction company agreed to construct the canal system so that the water conducted through the same would be available at a point not to exceed one-half mile measured in a direct line from each quarter section of the land included in the project.

2. To make water available under the provisions of said contract, means to bring it to the half-mile point from a quarter section of such land, measured in a direct line, in such a way that the water can be taken from the canal, or company lateral, to a point upon the land to be irrigated so that it may be used for the purpose of irrigating the land under a gravity system through ditches to be constructed by the settler.

3. Under said contract the duty devolved upon the settler or user of water to construct his own service ditch or ditches from the laterals of the construction company and to furnish one headgate for the purpose of diverting such water into his service ditch.

4. *Held,* that since the evidence shows that the service ditch for the east eighty-acre tract of plaintiff's land was not completed until May 26, 1909, the construction company was not liable for any dam-

---

The measure of damages for breach of contract to furnish water for irrigation is discussed in 19 L. R. A., N. S., 938; 31 L. R. A., N. S., 743.

ages to plaintiff's crops that occurred prior to that date on account of such crops not being irrigated.

[As to damages for injury to growing crops, see note in 140 Am. St. 309.]

5. *Held*, under the facts of this case that it was the duty and right of the plaintiff to construct a small check or dam across the channel of "B" coulee to turn the water therefrom into his service ditch, in case the bottom of his service ditch required that to be done in order to get his proper amount of water into it.

6. *Held*, that the court erred in instructing the jury that it was not the duty of the plaintiff to place said check or dam in "B" coulee for the purpose of turning the water therefrom through his headgate into his own service ditch.

7. Where a party can save himself from a loss arising from a breach of a contract at a small expense or with reasonable exertion, it is his duty to do so, and then he can recover such expense from the party liable, and also such damages only as with reasonable endeavor and expense he could not prevent.

8. *Held*, under the facts of this case, that the court erred in giving instruction No. 17 to the jury. .

9. *Held*, that certain evidence admitted under objection of the defendant was error.

10. *Held*, that the refusal to admit certain evidence offered on behalf of the defendant was error.

APPEAL from the District Court of the Fourth Judicial District for Gooding County. Hon. Edward A. Walters, Judge.

Action to recover damages for loss of certain crops. Judgment for plaintiff. *Reversed.*

S. H. Hays and P. B. Carter, for Appellant.

The fact that the company put a check in later on as a part settlement of another claim could not be introduced in evidence in this case. (*Holt v. Spokane etc. Ry. Co.*, 3 Ida. 703, 35 Pac. 39.)

That plaintiff could have built a substantial check for a reasonable amount is clear, and in such case he cannot recover damages for consequences which were avoidable by him. (Sedgwick on Damages, secs. 201, 202; *Warren v. Stoddart*, 105 U. S. 224, 26 L. ed. 1117.)

The court should have limited the damages to the value at the time of destruction. The instruction and ruling of the court upon the testimony was therefore erroneous. (*Hanes v. Idaho Irr. Co.*, 21 Ida 512, 122 Pac. 859.)

For injury during that portion of the season in which it is possible to reproduce the crop, the cost of replacement is the proper measure of damages. (Sutherland on Damages, p. 3001.)

After there is a crop in existence, the measure of damages is the value of the crop at the time of the injury or destruction. (*Risse v. Collins*, 12 Ida. 689, 87 Pac. 1006; *Lowe v. Yolo County Consol. Water Co.*, 157 Cal. 503, 108 Pac. 297.)

If it was our duty to put in the ditch and we failed to do so, the settler could not sit by and suffer the loss of a $3,000 crop for the want of a $50 check, and if he was required to put in a check which it was our duty to put in, the measure of damages is the cost of the check. (Sedgwick on Damages, secs. 212–b and 214–b.)

Guthrie & Bowen, for Respondent.

The contract should be given a reasonable construction. The word "available" in the construction company's contract means obtainable in a practical sense. (9 Cyc. 587.)

The following authorities sustain the instructions regarding measure of damages: *Montgomery v. Locke*, 72 Cal. 75, 13 Pac. 401; *Missouri K. & T. Ry. Co. v. Lycan*, 57 Kan. 635, 47 Pac. 526; *Kansas City etc. Ry. Co. v. Perry*, 65 Kan. 792, 70 Pac. 876; *Atchison etc. Ry. Co. v. Geiser*, 68 Kan. 281, 75 Pac. 68, 1 Ann. Cas. 812; *Mogallon G. & C. Co. v. Stout*, 14 N. M. 245, 91 Pac. 724; *Waldteufel v. Vineyard Co.*, 6 Cal. App. 624, 92 Pac. 747; *Rowe v. Chicago & N. Ry. Co.*, 102 Iowa, 286, 71 N. W. 409; *White v. Chicago etc. Ry. Co.*, 1 S. D. 326, 47 N. W. 146, 9 L. R. A. 824; *Carner v. Chicago etc. Ry. Co.*, 43 Minn. 375, 45 N. W. 713.

SULLIVAN, C. J.—This action was brought by the plaintiff, who is a settler on a Carey Act project, against the defendant, the construction company upon such project, for

damages caused to crops by reason of the various alleged breaches of contract on the part of the construction company with the state in the construction of the irrigating works upon said project, which failure, it is alleged, impaired the water supply and caused the plaintiff certain losses in his crops for the years 1909 and 1910.

The complaint sets forth two causes of action: One occurring in the year 1909 in the sum of $2,195, and the other in the year 1910 in the sum of $700. After a trial in the district court, judgment was rendered against the defendant corporation for the sum of $3,109.50, a part of the judgment being interest on the sum awarded as damages. A motion for a new trial was denied and the appeal is from the judgment and the order denying a new trial.

The breaches of contract on the part of the construction company in both causes of action, according to the allegations of the complaint, arise out of (1) the failure of the construction company to properly construct said irrigation system, and (2) a failure to supply the water as agreed.

We gather from the complaint that the failure to supply the water was because of the alleged improper construction of said irrigation system. It is provided in the contract of the construction company with the state that the construction company shall construct said canal system so that the water conducted through the same may be available at a point not to exceed one-half mile measured in a direct line from each quarter section of land described in the contract. To make water available, under the provisions of said contract, simply meant to bring it to the half-mile point from a quarter section of said land, measured in a direct line, in such a way that the water could be taken from the canal or lateral, to and upon the land to be irrigated, so that it may be used there for purposes of irrigating the land through the ditches to be constructed by the settler, under a gravity system.

Under said state contract, while the construction company retained control of the canal system, water should be measured to users at the place of diversion from the main laterals of said system in such quantities and at such times as the con-

dition of the crops and water might determine.  Under said contract, a main lateral is defined as ''a lateral taken from the main line of the canal.''  In many cases the construction company, in order to make the water available within a half mile of each quarter section, had to construct sublaterals from the main laterals, as was done in the case at bar.  The evidence shows that the water for the irrigation of the east eighty acre tract of respondent's land was taken from what is known as ''B'' coulee, which was used as a conduit or lateral by the construction company for conducting its water to users.

Under said state contract it is provided that ''a coulee or draw used as a main lateral or subordinate lateral shall also be included within these terms.''  Said ''B'' coulee was a natural channel where water evidently ran during the wet season before the construction of the canal system, and was dry at least a part of the year.  It does not appear whether the ''B'' coulee, from whence the respondent procured water to irrigate his east eighty, was a main or subordinate lateral. The record does not show where the point of measurement for the east eighty tract was located; however, plaintiff's service ditch was connected with said coulee and water taken therefrom to irrigate said land.

There were other users of water from said coulee, and it is clear that the construction company is not responsible for the misapplication of water by users themselves from a common or service ditch constructed and owned by themselves, since after the water is taken out into a service ditch from a main or subordinate lateral by irrigators, the construction company has no control over it.

As we gather from the record, the real matter complained of at the trial of the case was the alleged failure of the company to construct a check in said ''B'' coulee at the point where the plaintiff diverted his water.  It appears from the evidence that from and after April 6, 1909, the construction company had running in said coulee a stream of water sometimes ten feet wide, carrying water four inches deep, and sometimes forty feet wide, carrying in the middle of the stream

a foot and a half of water, at the point where the appellant had connected his ditch with said coulee from which to convey water to the east eighty of said land.

The evidence shows that the plaintiff did not complete his service ditch to a sufficient depth to take the water out of said "B" coulee without placing a check in said "B" coulee to raise the water into his ditch, at least not prior to May 26, 1909. During the month of May he lowered the bottom of his ditch about six inches, but it still required a check to get a satisfactory head of water into his ditch. He then put in another check in "B" coulee, which was not quite satisfactory to him. The evidence shows that said coulee at said point did not present any unusual difficulty in putting in a small check to raise the water, since said coulee carried water at times ten feet wide and at other times forty feet wide. The testimony shows that his check leaked or washed out under varying heads of water in the coulee.

The state contract required the construction company to construct and place in position all headgates, flumes, weirs and other devices for the control and measurement of water in the main canals and reservoirs, and in the main laterals, and it was intended that the settler should, under the direction of the chief engineer of the construction company, build and furnish one gate or other device for his own use, thus requiring the entryman to furnish one headgate, and if more were required, they were to be furnished at the expense of the construction company. It was contemplated that each settler would require at least one service ditch and would be required to put in at least one headgate. By the construction of a deep or shallow service ditch, the settler might control the question as to whether a check should be placed in the canal at the point of diversion of his water. If, because of constructing a shallow ditch, a check was required to be put in the lateral, the settler would be required to put in such check; and if a check in the canal or lateral was made necessary by the failure of the settler to construct his ditch as low as it ought to be constructed to carry water to his land, or by placing his headgate at a height that a check was nec-

essary, it was the duty of the settler to put such check in the main or sublateral from which he took his water.   The settler was required to use reasonable care in the construction of his ditch, and to avoid placing checks in the main or sublateral, he ought to construct the bottom of his ditch as low as the bottom of the lateral from whence he took his water, if that could reasonably be done.

The court instructed the jury that it was not the duty of the settler to place a check or dam or any other obstruction in a main or subordinate lateral to raise water into his ditch, but that that was the duty of the company under the contract, and that it was not sufficient for the company merely to bring water within the half-mile limit but that the canals, laterals and ditches must be so constructed at the point where the water is taken out by the settler, that is, it must be at such a level, to make it practicable for him to obtain it.

By the eighth instruction given by the court, the jury was instructed that if, in order to make water "available" for a settler within the half-mile point, it was necessary to raise the level of the water in the company's canals, coulees or ditches, it was the duty of the company to do so by constructing checks, dams or such other devices as would be appropriate for that purpose, and under such conditions it was not the duty of the settler to enter upon the canals, laterals or coulees of the company to place any checks, dams or other obstructions therein except a headgate through which the water might pass into his ditch.

That instruction, as well as instructions 9, 10 and 11, are erroneous, since they disregard the fact as to who was responsible for the necessity for such check or dam being put in. If it were because the settler had not properly constructed his ditch and had not made the bottom of it as low as it ought to have been made, then it was the duty of the settler to put in the check or dam.   Under said contract it was the duty of the construction company to bring the water to the half-mile point so that it might be "available" to the settler, and if a check was made necessary on account of the manner of the construction of the settler's ditch, then it was the duty of

the settler to put in the check, that is, provided the bottom of his ditch was not put upon a proper grade, where that could reasonably be done.

The point where the diversion of the water was made from "B" coulee by said service ditch was not at the half-mile point from said land, but was at a point very much nearer. This was certainly an advantage to him. The legal obligation of the construction company, however, did not extend further than putting the level of the water at a proper grade at the half-mile point. The evidence shows that it was owing to the manner of the construction of plaintiff's service ditch that it became necessary to put in a check at the point of diversion.

The court in its instructions limited the word "headgate," and did not include therein the necessary check where such was required on account of the plaintiff's not constructing his ditch at the proper grade and on account of the manner in which the headgate was set.

It appears from a plat introduced in evidence that the point from where the plaintiff took out his said service ditch was only about 1,500 feet from the east boundary of his land. His point of diversion then was considerably within the half-mile point to which the construction company was required to make the water available.

Plaintiff alleges in his complaint that water was not made available at said point until the 27th of May, 1909; that he did not have his said ditch properly constructed until May 26, 1909. Now, if the settler seeks to divert his water at a more convenient point less than a half mile from his land, some duty rests on himself; and if it were the duty of the company to build the check and it failed to do so and the plaintiff undertook to build it, as he did in this case, it was his duty to build it efficiently, or to put in a substantial check, and damages for failure to build the check by the company, if it were its duty, would be confined to the cost and expense of building such check and not to any problematic loss of crops.

The record shows that before said check was put in, and as early as the 6th of April, 1909, the water flowed down said "B" coulee at least four inches deep and ten feet wide and sometimes much deeper and wider. Thus it is made to appear that there was sufficient water there to supply plaintiff's wants had his ditch been properly constructed and the proper check put in.

The evidence shows that the check could have been put in at the expense of a very few dollars, and was so put in by the plaintiff himself. The court correctly instructed the jury that if the plaintiff could have avoided the damages at a comparatively small expense by the construction of a check in said coulee, the loss occasioned by the failure to put in the check could not be charged to the defendant. Evidently the jury paid no attention to said instruction. That he could have built a substantial check for a reasonable amount is clear from the evidence, and in such a case, under the authorities, he cannot recover damages for consequences which he could have avoided by building such check. (Sedgwick on Damages, secs. 201, 202; *Warren v. Stoddart,* 105 U. S. 224, 26 L. ed. 1117.)

Plaintiff seeded a part of said east eighty to oats and alfalfa along about the 18th of April. He was delayed in getting powder that he needed for blasting some rock out of the bottom of his ditch, and his own testimony shows that his alfalfa began to suffer for water along about May 10th. If his alfalfa died before he had his own ditch finished, the construction company was not liable.

The plaintiff testified that there were about twenty times for from two to three hours at a time in which he did not get water, which would make a total, figuring it at three hours each time, of sixty hours that he did not get water.

The evidence shows that there was sufficient water in "B" coulee to supply the plaintiff's wants and to give him more than he was entitled to under his contract.

He testified that before he put in the check, the width of the water at the head of his ditch varied from ten to forty feet, and that the water was from four inches to a foot and a

half deep, with a pretty fair grade. A stream of water ten feet wide and four inches deep with a pretty good grade certainly would supply him with more water than he was entitled to under his contract.

Johnson, a witness for plaintiff, testified as to the oats and alfalfa on the east eighty as follows: "The oats and alfalfa did not look good on the 26th day of May. They needed water prior to that time. They needed water about the 10th of May. From the 10th of May until the 28th they were suffering for water."

Plaintiff testified that the alfalfa was practically killed before the 26th of May, thus showing that the alfalfa was killed before the plaintiff had completed his service ditch. And the record does not show that the construction company was at fault because the plaintiff did not complete his service ditch prior to that time or in time to save his crop.

Johnson further testified that he was working for the plaintiff and was able to get about a foot of water through the ditch at the head. He also testified that a part of this water was used by Massey; that he did not irrigate at night; that he shut off the water at night but that it would come down with so much force that it would shove the gate out; that said headgate was only temporary and trouble usually happened at night; that he had not aimed to take all of the water of "B" coulee; that some of it he could not help going down to the neighbors below; that when he could not handle the water alone he called in men to help him; that he could handle on that place a second-foot of water.

Plaintiff's evidence shows that he had a second-foot or more of water in his service ditch, and since he had only about seventy acres of the eighty in cultivation, under his contract he would only be entitled to seven-eighths of a second-foot. He let another settler have a part of this water. The state contract provided for rotation in the irrigation of the lands of the settler, and the plaintiff alleges that he was short of water. Still he did not irrigate nights when there was evidently plenty of water in "B" coulee, for, as his own witness states, when he turned off the water at night it would

come down with so much force that it would shove the head-gate out. This certainly would indicate that the plaintiff did not exercise diligence in the use of the water, or at least did not use it at night when there was plenty in "B" coulee.

Even if we concede that the fault was with the construction company in regard to constructing said check, the company certainly was not responsible for the failure of the plaintiff to construct his own ditch in time to save his crop, and his failure to use the water in the night-time, when there was plenty and no one to use it.

If the alfalfa land could have been successfully reseeded after the 26th of May, plaintiff certainly should have protected himself by reseeding. His evidence shows that he seeded on the west eighty tract certain land to alfalfa after the 10th of June and got a good stand. It was error for the court to exclude this view of the matter, as shown by the evidence, from the jury, and the court's instruction No. 17 was clearly erroneous, because, had he reseeded and gotten a good stand, the measure of damages would be the cost of reseeding and not the value of the crop in the fall of the year, if the fault was wholly on the part of the construction company.

In 1909 the record shows that the plaintiff raised on the 70 acres of the east eighty 1,700 bushels of oats, making about 25 bushels to the acre. It is his claim in this case that he would have raised 40 bushels per acre, or a total of 2,800 bushels, if the defendant had properly constructed its irrigation system and furnished him water. In addition to this, he alleges that the oats were planted as a "nurse crop" for the alfalfa, and that he failed to get a stand of alfalfa on 33 acres thus planted, causing additional damage in the sum of 25 dollars per acre, thus claiming that the shortage in his oat crop and failure to get a stand of alfalfa resulted in his damage.

On the west eighty he had seven acres to alfalfa which was planted without a "nurse crop." This planting was done after the planting on the east eighty was done. This alfalfa thrived and has made a satisfactory crop. Sixty

acres of oats were also planted on the west eighty. Fifty-six acres of these yielded a total of 300 bushels, and it is plaintiff's claim that they should have yielded 40 bushels an acre, or a total of 2,240 bushels. Four acres were cut for hay, which it appears would have yielded about 20 bushels to the acre had it been threshed. The average crop of oats on the land in that vicinity that year was 23 bushels per acre, and of wheat, 15 bushels.

On both eighties the damage is alleged to be $2,195 for the year 1909, and for the year 1910, $700.

It appears from the record that the average yield of oats in that locality in 1910 was 32 bushels per acre, and wheat, 24 bushels to the acre.

So far as the west eighty is concerned, the plaintiff in connection with two other parties constructed a ditch extending in a southwesterly direction from its connection with the company lateral "J 2." The company also constructed "1 C 1" lateral, which brought the water within about a quarter of a mile of plaintiff's west eighty, and he and Risberg and Barclay constructed a service lateral extending from the company lateral "1 C 1" to and upon their respective lands.

Risberg testified on behalf of plaintiff that he put in a box to measure the water for his own use and that he acted as water-master between the plaintiff and his neighbor Barclay; that he divided the water between them (plaintiff, Barclay and witness) according to the best of his judgment, and he gave plaintiff about one-half of it; that in 1909 there was close to a foot and a half of water going through the box; that in 1910 he divided the water and regulated the gates; that he divided the water the same as he did in 1909; that there was more water in 1910 a part of the time than in 1909; that in 1910 the water came through the box six or seven inches deep; that the water supply did not continue through the entire season; that it commenced to decline about the middle of July and went off about the 29th; that after the 29th of July, it came on again about the 10th of September and the plaintiff's crop needed water between the 29th of

July and the 10th of September; that the oat crop on the west eighty was not a very good prospect when the water went off; that they needed water about two weeks longer to develop a full crop; that in 1910 the amount of water going over the box would be close to two second-feet.

Massey testified that about July 5, 1910, the water went out of "B" coulee and came back on the 8th and that there was an intermittent service from then until July 29th.

Barclay testified that in 1909 he had ten acres of his eighty planted to alfalfa with a "nurse crop" of oats; that he got a good stand of alfalfa; that he takes his water below both plaintiff and Risberg from the same service ditch; that he got a good stand of alfalfa and twenty bushels of oats per acre in 1909; that he got his water after the plaintiff and Risberg got theirs; that in 1910 Risberg and he would go to the diverting device and take what Risberg thought witness was entitled to and Risberg and Collins had the balance; that he (witness) was the lowest man on the ditch.

On the part of the construction company there was introduced in evidence the record of the ditch riders, showing that below the place of diversion on said "B" coulee in 1909 there was an abundant water supply which must of necessity come past plaintiff's point of diversion.

The record shows that in 1909 on the west eighty of plaintiff's land sixty-seven acres were in cultivation, entitling plaintiff to 67/80 of a foot of water as a maximum amount, and Barclay and Risberg each had fourteen acres, making a total of twenty-eight acres, or a total amount of ninety-five acres in cultivation. They were entitled to receive for the irrigation of this ninety-five acres of land 1 15/80 second-feet of water. Witness Risberg testified that in 1909 they had 1½ second-feet and in 1910, a part of the time at least, there was two cubic feet of water running through his box. It appears from the record that the difficulty on the east eighty was not with the water supply, but with the check that plaintiff put in which leaked and required frequent repairs.

Certain evidence was introduced in regard to apple grafts, and some of the witnesses called them apple trees. The measure of damages fixed by the court in its instructions, and to which testimony had been directed, was the total value of such grafts in the fall of 1909, without any deduction for the care and cultivation of the grafts during the summer season. The court should have limited the damages in that matter to the value of the destruction. It was error for the court to admit testimony as to the value of such grafts in the fall of 1909.

The trouble between Gleason and the plaintiff in regard to the latter's taking his ditch across the Gleason land was settled on the 26th of April, 1909, and the evidence shows that the crop died, or was injured, between the 10th and the 26th of May. Not having completed his ditch until the 26th of May, plaintiff could not get any water on his crop and much of the injury, at least, was occasioned by the failure of plaintiff to have his ditch completed in time.

The court permitted plaintiff to introduce testimony to show that the construction company in 1911, about two years after the injury complained of, put a check in "B" coulee at the point referred to, it appearing that the check was put in as a part of a settlement of a claim made by one Massey; who also used the water through plaintiff's ditch.

This was error, since it was improper to admit in evidence testimony showing that on account of a settlement of another claim the construction company had put in a check or dam at the place referred to. This was not proof that it was the duty of the construction company to place such a check in said coulee in order to raise the water high enough to put it into the plaintiff's ditch.

It appears from the instructions given by the court that the measure of damages for the destruction of the alfalfa was the amount of its value on the land in the fall of the year. This was clearly error. Even if such damages were occasioned by the failure of the company to furnish water, the measure of damages would be the value of the crop at the time of its destruction. However, the rule would be dif-

ferent if the stand of alfalfa had been permanently established and was destroyed thereafter; but the evidence shows that it had not been established. Therefore, it was not an existing meadow of alfalfa. It is a well-established rule that for injury during that portion of the season in which it is possible to reproduce the crop, the cost of replacement is the proper measure. (Sutherland on Damages, p. 3001.)

In *Risse v. Collins*, 12 Ida. 689, 87 Pac. 1006, the court held that the measure of damages for the destruction of growing grass is its value at the time and place it was destroyed.

The testimony of plaintiff's witness Gleason shows that it is a difficult matter to get a good stand of alfalfa in that region of the country, and the opinions of witnesses in a new country like the one in which this land is situated, in regard to the number of bushels per acre of wheat or oats that ought to be raised on certain land, should be received with allowance where such testimony shows that the witnesses placed this estimate much above what the average land in that vicinity is shown to have produced per acre.

For the year 1910 we find no testimony as to what the water supply was at the point of measurement provided in the state contract. The only testimony is that the water began to get low from the 5th to the 15th of July. Just how low is not stated, and the water went off on the 29th of July and stayed off until the 9th of August, a period of nearly two weeks. The evidence does not show why this occurred nor whether it was the company's fault. In such a case as this the *allegata* and *probata* ought to correspond.

For the reasons above given, the judgment must be reversed, and it is so ordered, and a new trial granted, and the cause remanded for further proceedings in accordance with the views expressed in this opinion. Costs awarded to appellant.

Budge and Morgan, JJ., concur.