## TWIN FALLS LAND & WATER CO. v. TWIN FALLS CANAL CO. *

### No. 7503.

Circuit Court of Appeals, Ninth Circuit.
Sept. 9, 1935.

*Writ of certiorari denied 56 S. Ct. 381, 80 L. Ed. —.

**432**

W. G. Bissell and Branch Bird, both of Gooding, Idaho, for appellant.

J. R. Bothwell and Harry Povey, both of Twin Falls, Idaho, and Edwin Snow, of Boise, Idaho, for appellee.

Before WILBUR and GARRECHT, Circuit Judges, and NETERER, District Judge.

WILBUR, Circuit Judge.

This is an appeal from a decree in favor of the defendant in a suit in equity brought by the Twin Falls Land & Water Company to compel the sale of additional water rights in the Twin Falls irrigation project. These corporations, plaintiff and defendant, were formed for the purpose of carrying out a reclamation project in Twin Falls county and Jerome county in the state of Idaho, in which that state and the United States were both interested. The project had for its object the reclamation of public desert land by irrigation from the waters of the Snake river. Most of the land belonged to the government of the United States and 244,025.98 acres of such land in Twin Falls county south of the Snake river were segregated under the Carey Act (43 USCA § 641 et seq.) for reclamation under the project. There was also a large amount of public school land belonging to the state of Idaho susceptible to irrigation under the proposed works. In addition, 32,000 acres of land north of the Snake river in Jerome county were included in the project. These Jerome county lands and the 400 second feet of water that was appropriated for their irrigation have been transferred to the Twin Falls North Side project and are not involved in this suit.

Appellant appropriated from the waters of the Snake river for this project 3,000 second feet measured at the Cedars, now known as Milner Dam, on the river and entered into a contract with the state of Idaho for the construction of the dams, canals, and other works necessary for the diversion of such water and its transportation to within one-half mile of each subdivision receiving water. We will hereafter refer to the appellant as the construction company. The construction company was to be reimbursed for the cost of construction, estimated at $1,500,-000, and was to secure its profit, if any, by the sale of water rights to be evidenced by shares of stock in an operating company, which shares of stock were to be appurtenant to the various parcels of land entitled to irrigation from the canal. Two hundred three thousand five hundred sixty-eight and 47/100 shares of stock in the operating company have been sold. The principal question involved in the case at bar is as to the sale of 36,431.53 shares of stock, the unsold balance of shares in the operating company (a total of 240,000 shares), and this question turns in part upon the availability of water to be represented by the shares when sold. The exact amount of water to which the purchaser of stock is entitled is one of the points in dispute. The amount specified in the various applicable agreements is 1 second foot continuous flow for 80 acres, equivalent to 5/8 of a miner's inch per acre. The dispute as to the contract quantity relates only to whether the point of measurement is at Milner Dam, the point of diversion on Snake river, or within ½ mile of the settler's land to be irrigated. The loss due to seepage and evaporation in the canals amounts to about 20 per cent., so that the question stated resolves itself into the question of whether 1 second foot of water at the dam should irrigate 80 acres or 100 acres, in other words, whether the

3,000 second feet was to irrigate 240,000 acres or 192,000, or allowing 10 per cent. for roads, buildings, etc., a total of 213,-333⅓ acres.

The contract between the construction company and the state of Idaho contained the following provisions relating to the water rights to be sold:

"The main canals of this system shall have a carrying capacity when completed sufficient to deliver simultaneously one second foot of water to every eighty acres of land described in this contract, together with all other lands susceptible of irrigation from said canals. * * *"

"Each of said shares or water rights shall represent a carrying capacity in said canal sufficient to deliver water at the rate of one-eightieth of one second foot per acre, and each share or water right sold or contracted as herein provided shall also represent a proportionate interest in said canal, together with all rights and franchises, based upon the number of shares finally sold in the said canal. * * *

"But in no case will water rights or shares be dedicated to any of the lands aforementioned or sold beyond the carrying capacity of the canal system nor in excess of the appropriation of the water as hereinbefore mentioned. * * *

"The certificates of sale of water rights and the certificates or shares of stock of the Twin Falls Canal Company, Limited, shall each, upon being issued to the purchaser or holder of land under the canal system, be made to dedicate and define in the contract or certificates, as the case may be, the amount of water, to-wit: one-eightieth of a second foot allotted to each acre represented thereby, and carrying capacity of the canal sufficient therefor, the water to be delivered from the canal during each and every irrigating season, said amount to be measured at or within one half mile of the place of intended use in such quantities and at such times as the condition of the soil, crops and weather may determine, but according to such rules and regulations based upon a system of distribution of water to the irrigators in turn and by rotation as will best protect and serve the interest of all the users of water from this canal system. * * *

"It is hereby agreed that every purchaser of shares in said canal or holder of stock in said Twin Falls Canal Company, Limited, shall be entitled to have delivered, for the irrigation of his land, its full amount of water as herein provided. * * *"

The defendant was organized in pursuance of the contract between the state of Idaho and the construction company to take title to the irrigation works and to manage and operate the irrigation system for the settlers and owners of the water rights purchased from the construction company. Each purchaser of land and water rights was to have 1 share of stock for each acre of land under the system. Thus the appellee represents the purchasers of land and water and operates the system and distributes the water for them. This company will hereafter be referred so as the operating company. The construction company was authorized by its contract with the state of Idaho to sell 1 share of stock in the operating company for each acre of government land under the project at $25 per share and 1 share of stock for each acre of state school land under the project at $15.50 per share. The total number of shares of the operating company was fixed at 240,000 by the contract between the state of Idaho and the construction company.

The construction company appropriated 3,400 second feet of the natural flow of the Snake river on October 11, 1900. It entered into a construction contract with the state of Idaho on January 2, 1903. The project was completed in 1909 and a majority of the stock had then been sold. In 1910, after the sale of 197,-825.49 shares in the operating company by the construction company, a dispute arose as to the adequacy of the water supply to irrigate the lands for which water rights had already been sold. The operating company claimed that no further water rights should be sold. The construction company desired to immediately dispose of 5,000 shares of the remaining 42,174.51 shares to irrigate land susceptible of irrigation from the system by pumping, called the High Line project. The attempt to settle this dispute finally resulted in a contract of December 31, 1910, by which the construction company, in consideration of the consent of the operating company to the sale of the 5,000 shares for the pumping project, transferred the remaining shares (37,174.51) to the operating company. The rights of the parties involved in this suit largely

turn upon the interpretation of this contract of December 31, 1910. If the contract had simply provided for the transfer to the operating company of all the unsold stock in the operating company, little difficulty would arise, but the contract, after providing for the transfer of the stock, provided that if additional stock was sold by the operating company, the proceeds should be divided equally between the construction company and the operating company and the share of the proceeds of the construction company should be held in trust by the operating company. The dispute herein largely centers around this provision of the contract, the construction company claiming that the one-half of the unsold stock was held in trust by the operating company for it and the operating company contending that it became the absolute owner of the unsold stock with absolute discretion, in the nature of a power, as to whether or not any stock should be sold at any time, and that only in case of sale had the construction company any

interest in the matter and then only in one-half of the proceeds. The construction company claims that the operating company, as trustee, has not acted in good faith in claiming a shortage of water and that by such false claim it has been able to increase the water rights of its stockholders by claiming and distributing all the appropriated water to their land to the exclusion of the other land for which the water was originally appropriated. The operating company contends that water rights were already oversold by the construction company at the time of the settlement and that there was no water then, or since, available for sale and that it has sold none voluntarily since that time. As will be presently stated, some was sold in compliance with a mandate of a court. In view of the importance of the applicable provisions of the contract of December 31, 1910, we set out the entire contract in the footnote.[1]

At the threshold of the inquiry as to surplus water lies the question of the contractual rights of those who have pur-

[1] "This agreement made and entered into this 31 day of Dec. A. D. 1910 by and between Twin Falls Canal Company, an Idaho corporation, first party, and Twin Falls Land & Water Company, a Utah corporation, second party, witnesseth:

"Whereas on even date herewith the said second party has assigned and transferred to the first party forty-two thousand one hundred seventy-four and fifty-one one-hundredths (42,174.51) shares of the capital stock of said Twin Falls Canal Company, evidenced by certificate No. 1319 in said corporation,

"Now therefore the said parties hereto for and in consideration of the sum of one dollar to each of them in hand paid by the other, receipt whereof is hereby acknowledged, hereby mutually undertake, covenant and agree as follows:

"1. It is mutually agreed that the proceeds derived from the sale of any and all of said shares of stock as hereinafter provided for shall be held in trust for the parties hereto in equal shares and that in the event the Twin Falls Canal Company shall hereafter conclude that there remains in its canal system (known as the Twin Falls South Side System) water rights in excess of the number of shares of stock in said corporation already issued and not otherwise, (as defined in that certain contract between the State of Idaho as first party and the Twin Falls Land & Water Company as second party, bearing date January 2, 1903), then it, the said Twin Falls Canal Company shall endeav-

or to sell said shares of stock to represent the surplus and excess water rights in said canal system, and that upon the sale of any of said shares of stock as herein contemplated the gross proceeds derived from said sale shall be divided equally between the parties hereto, (gross proceeds to be construed to mean the entire purchase price agreed to be paid by the purchaser), and for the purpose of making said division of said gross proceeds the said Twin Falls Canal Company agrees to divide all cash payments made upon said contracts respectively as each contract is entered into in equal shares between the parties hereto, and contracts for the sale of said water rights it agrees to divide between it and said Twin Falls Land & Water Company in equal shares as to face value immediately upon the taking of each respective contract. It being the intention that said contracts shall be divided alternately between said parties hereto to the end that the cash received by each party shall be equal in amount and the face value of said contracts received by each of them respectively shall be equal in amount as to face value.

"2. That in the event the said first party herein shall lease any of said excess water rights, one-half of the gross proceeds received as rental thereof shall be immediately paid to the Twin Falls Land & Water Company and the other one-half retained by said first party.

"3. That the assignment and transfer by the second party of said forty-one

chased water rights from the construction company. Was the contractual water right 1 second foot to each 80 acres or to each 100 acres? That is to say, was the water to be measured at Milner Dam or within ½ mile of the land to which it was to be applied? This question was considered by the Supreme Court of Idaho in what is called the West Case (State v. Twin Falls Canal Co., 21 Idaho, 410, 121 P. 1039, L. R. A. 1916F, 236) in entertaining a petition for a writ of mandate to compel the operating company and the construction company, both defendants therein, to sell additional shares of stock to a purchaser of state school land, whose land was within the original segregation of land and within the area covered by the irrigation system. The matter was determined upon demurrer. The court held in its original opinion that under the allegations of the petition there was ample water. It also held that, inasmuch as the project contained 240,000 acres of irrigable land, and as the appropriation was 3,000 second feet measured at Milner Dam, the right for each tract owner must necessarily be measured at the same place, otherwise there could not be 1 second foot for each 80 acres in the project. Two justices concurred in this conclusion. The third justice dissented on the ground that the express contract was that the water right of each

---

thousand one hundred seventy-four and fifty-one one-hundredths (42,174.51) shares of stock as evidenced by said certificate No. 1319 in said Twin Falls Canal Company is made by said second party and received by the first party with the understanding and agreement that the same shall be sold and disposed of and shall be subject to all of the terms and conditions set forth in that certain contract made and entered into between the said State of Idaho as first party and the said Twin Falls Land & Water Company as second party, bearing date January 2, 1903, subject however to any amendments or modifications of said contract as to the price of water rights under said system which have been heretofore made with the consent of the State Board of Land Commissioners of the State of Idaho, or that may hereafter be so made, and provided that in no event shall said shares of stock be sold at a price less than $25.00 per share where the water right evidenced by the same is to be used upon Carey Act lands, and at not less than $15.50 where the water right evidenced by the same is to be used upon state lands, and in the event said water right is not sold for use upon state lands within one year next after the date that the contract with the state for the purchase of land is entered into, then said stock is to be sold at not less than $25.00 per share, and at not less than $35.00 per share with accrued interest from February 10, 1910 at the rate of six per cent per annum where said right evidenced thereby is to be used upon Desert or Homestead lands.

"4. It is understood and agreed between the parties hereto that nothing herein shall be construed to apply to any waters that may hereafter be appropriated by the said Twin Falls Canal Company, nor to any of the increased capital stock of the Twin Falls Canal Company, if its capital stock shall be hereafter increased by the stockholders of said company, and that all water hereafter appropriated by the Twin Falls Canal Company shall be evidenced by the increased capital stock of said company and not by any of its present authorized capital stock.

"5. It is also understood and agreed by and between the parties hereto that nothing herein shall be construed to prevent a sale or lease by the Twin Falls Canal Company of water hereafter appropriated by it for use upon lands embraced within the present Carey Act Segregation or the Twin Falls Land & Water Company dated July 1st 1901, said lands being enumerated in List No. 6 of the State of Idaho and filed at the land office at Hailey, Idaho (as modified or amended) after said segregation shall have expired, and in this respect said Twin Falls Land & Water Company shall not have the time of said segregation extended in any way. It being the spirit and intent of this contract that and the first party agrees that it will not undertake to or sell any water rights from appropriations of water hereafter made by it for use upon any of the lands described in said segregation until it shall have sold all surplus water rights, if any, existing under the appropriations mentioned in said contract between the State of Idaho and the Twin Falls Land & Water Company bearing date January 2, 1903.

"In witness whereof the parties hereto have caused these presents to be executed on their respective behalfs by their respective Presidents and their respective corporate seals to be hereunto affixed the day and year first above written.

"Twin Falls Canal Company
"[Seal] [Signed] By T. Wiglesworth,
Its President
"Twin Falls Land & Water Company
"[Seal] [Signed] By F. H. Buhl,
Its President."

landowner was to be measured at a point within ½ mile of his land to which point the operating company agreed to deliver his water. It is contended that this decision of the Supreme Court of Idaho is binding upon us and that consequently we must hold that seepage and evaporation losses must be borne by the individual water user. The operating company contends that on rehearing the Supreme Court of Idaho abandoned its majority opinion, and that in any event the decision has been overruled in later decisions dealing with this particular water right (State v. Twin Falls Canal Co., 27 Idaho, 728, 151 P. 1013, known as the Weaver Case; State v. Twin Falls Land & Water Co., 37 Idaho, 73, 217 P. 252, 257, known as the Rice Case; Boley v. Twin Falls Canal Co., 37 Idaho, 318, 217 P. 258), and with similar rights (State v. Twin Falls-Salmon River Land & Water Co., 30 Idaho, 41, 166 P. 220, known as the Rayl Case; Twin Falls Salmon River Land & Water Co. v. Caldwell (C. C. A.) 242 F. 177, known as the Caldwell Case; Tapper v. Idaho Irrigation Co., 36 Idaho, 78, 210 P. 591; Vinyard v. North Side Canal Co., 47 Idaho, 272, 274 P. 1069).

In the West Case, supra, a rehearing was granted. The effect of the order granting the rehearing was to set aside the previous opinion. On rehearing the court stated the grounds upon which it proposed to grant the writ of mandamus. The construction of the contract for a water right stated in the previous opinion was apparently abandoned, although that is not altogether clear. The court on rehearing gave as the grounds for its action that by the contract between the construction company and the state of Idaho a proportionate part of the appropriated water of Snake river was dedicated to state owned lands within the bounds of the segregated area and the purchasers of such land were entitled to 1 share of stock per acre; that it was not shown by the pleadings that there was not sufficient water to supply to all consumers and furnish the petitioner with the amount demanded; and that the operating company was bound to employ the most economical method possible in the distribution of water, and, if necessary, to adopt a system of rotation so as to increase the head of water delivered to the consumer. The syllabus by the court declares, "Under the provisions of said contract, each owner of land is not entitled to a constant flow of one-eightieth of a second-foot of water per acre." This phrase "constant flow" in the syllabus is evidently used to distinguish between the same amount of water in the aggregate delivered by a system of rotation, instead of by constant flow, such as twice as much for half the time. In any event, however, the landowner was entitled to the equivalent of 1/80 second foot constant flow per acre or as the court holds to his proportionate part of it. The final holding then of the Supreme Court of Idaho in the West Case was that each purchaser of land, at any rate of state land, in the segregated area was entitled to his pro rata of the appropriated water, which by the act of appropriation and by the act of segregation of land was dedicated to the use of the entire tract, and this amount was admitted to be sufficient to properly irrigate such land.

If this is the theory of the West Case on rehearing, it is clear that it has been utterly abandoned and repudiated by the later decisions of the Supreme Court of Idaho, above cited, under the facts as subsequently brought to the attention of that court. The error in the West Case arose from the failure of the parties to present all the facts relevant to the interpretation of the contract as subsequently pointed out by the Supreme Court of Idaho in the Rice Case, supra. The court there said:

"Respondents in support of their application for this writ rely largely upon the authority of State and West v. Twin Falls Canal Company, 21 Idaho, 410, 121 P. 1039, L. R. A. 1916F, 236. * * * It appears that the conclusion arrived at in the majority opinion was based upon assumed conditions widely at variance with what the facts are conceded to be in case at bar."

As the appellee operating company states:

"Among the assumed facts which the Supreme Court in the West decision apparently relied on was the intention disclosed by the state contract to irrigate 240,000 acres of land with the 3,000-second-foot water right; that this conclusion was quite at variance with the facts is indicated by Exhibit 275, introduced in evidence in this case, in which it clearly appears that the proposal upon which

the contract was based exhibited a 3,400 second feet water right, and that with reference to the lands proposed to be reclaimed, the proposal stated:

" 'It will undoubtedly be found that there is a considerable acreage lying under the proposed canals that can never be irrigated. This acreage will consist of broken or rocky land along the Snake and Salmon R. Canyons, fractions of legal subdivisions extending above the canals, and isolated knolls and ridges lying in such a way that they cannot be reached by laterals. The total of these lands probably amount to 55,000 acres, leaving an acreage to be actually watered of about 200,000 acres. * * *' "

The Supreme Court of Idaho, for the reason that the factual situation presented to them in the Rice Case, supra, differed from that in the West Case, supra, refused to follow its decision in the West Case and stated:

"A water right in this system represented one-eightieth of a second foot per acre, and the main canal had, or was required to have, a carrying capacity sufficient to deliver water during each and every irrigating season in this amount to every user thereunder, to be measured within one-half mile of the place of intended use, in such quantities and at such times as the conditions of the soil, crops, and weather might determine. * * *

"It cannot be presumed that the present users of water under this system, when they acquired their rights to its use, intended or understood that they were to receive only an indefinite fractional part of this original appropriation of 3,000 second feet, instead of the definite, specific quantity mentioned in the granting clause of their contracts. Such meaning is clearly contrary to the language used. * * *"

This decision was followed two months later in the case of Boley v. Twin Falls Canal Co., 37 Idaho, 318, 217 P. 258, 263, supra. In that case the construction company, after the contract of December 31, 1910, supra, had contracted to sell some of the alleged surplus water to Boley for use on 80 acres of state land within the segregated area, which was susceptible to irrigation by gravity from the canal system of the project. The court held that the settlers' contracts for water "were contracts for the sale of a specific water right for each acre of land described," quoting from Twin Falls Salmon River Land & Water Co. v. Caldwell, supra. It also held on the authority of the Rayl Case, supra, that the theory of a proportionate share of water for each piece of land, announced in the West Case, supra, was inapplicable to the Twin Falls project, where there was insufficient water to furnish the maximum amount agreed to be furnished to prior settlers, "that amount being necessary for the successful irrigation of their lands." The court again held that the contract with the settler was for "the definite, specific quantity mentioned in the granting clause of their contract," that is, 1 second foot for each 80 acres, and that no further sale should be allowed which would diminish the maximum amount purchased by prior purchasers, "that amount being necessary for the successful irrigation of their lands." See also, Collins v. Twin Falls North Side Land & Water Co., 28 Idaho, 1, 152 P. 200; Ricker v. Twin Falls North Side Land & Water Co., 39 Idaho, 93, 226 P. 167; Vinyard v. North Side Canal Co., Ltd., 47 Idaho, 272, 274 P. 1069.

Without further discussion of the authorities above cited, it is clear that the contract requirement is $\frac{1}{80}$ of a second foot per acre measured within $\frac{1}{2}$ mile of the land of the purchaser. This has been the uniform construction of the contract followed in the furnishing of water. The amount specified in the contract has been measured at a point within a half mile of the premises to be irrigated without diminution for evaporation or seepage. So far as the construction company bases its right to enforce the sale of stock to represent the 20 per cent. of seepage and evaporation, it must fail.

The construction company contends that in the delivery and use of water there has been excessive waste and with a reasonably economical use, such as is required by the doctrine that no appropriator of water can have a right to use water in excess of that put to beneficial use by him, there would be sufficient water to irrigate all of the land represented by the unsold shares. Much evidence was introduced in the lower court upon the question of the "duty of water," that is, the amount reasonably required for irrigation. The trial court accepted the evi-

dence of the actual users of water on the project and held that there was no excess of water over and above that put to beneficial use by the irrigators under the system. It may be conceded that as against the state and others entitled to use the waters of the Snake river the amount of water to which the individual user is entitled cannot exceed the amount which he can beneficially use. The construction company is in no position to claim that the amount of water it contracted to furnish to the individual water user is excessive, or to insist that the wastage be sold to others, to whom it would thus be agreed to furnish the same excessive amount from the excess.

We conclude that the right of the construction company to sell water from its appropriation was exhausted when it had sold all of the water it could deliver within ½ mile of the users' property at the rate of 1 second foot for each 80 acres. Its agreed compensation was for this amount and no more. This conclusion, which we think is in accord with the decisions of the Supreme Court of Idaho, above cited, and with the meaning and purpose of the contracts relating to the construction and use of the irrigation system involved, makes it unnecessary to further consider the many questions relating to the water supply of the operating company, which are so fully and ably presented by the arguments and briefs and by the evidence adduced before the trial court, as all of these matters relate to the claim that the contract amount of water as above fixed is available and excessive.

Decree affirmed.