(June 1, 1922.)

W. J. TAPPER and S. B. HOPKINS, Appellants, v. IDAHO IRRIGATION COMPANY, LIMITED, Respondent.

[210 Pac. 591.]

CONTRACT — INTENTION OF PARTIES — CAREY ACT COMPANY — WATER SUPPLY.

1. The intention of the parties is to be deduced from the language employed by them, and the terms of the contract, where unambiguous, are conclusive, in the absence of averment and proof of mistake, the question being, not what intention existed in the minds of the parties, but what intention is expressed by the language used. When a written contract is clear and unequivocal, its meaning must be determined by its contents alone; and a meaning cannot be given it other than that expressed. Hence words cannot be read into a contract which import an intent wholly unexpressed when the contract was executed. Where the contract evidences care in its preparation, it will be presumed that its words were employed deliberately and with intention.

2. A Carey Act company will be held to the performance of its contract to deliver to a purchaser the water provided for by the contract, or respond in damages for its default in this regard, unless such performance is shown to have been excused.

Publisher's Note.

2. What constitutes excuse for irrigation company's failure to supply water in accordance with contract, see note in Ann. Cas. 1912C, 1031.

APPEAL from the District Court of the Fourth Judicial District, for Blaine County. Hon. H. F. Ensign, Judge.

Action for damages. From judgment for defendant, plaintiffs appeal. *Reversed.*

Harlan D. Heist and Hawley & Hawley, for Appellant.

Under the contracts between the plaintiffs and the defendant the plaintiffs were entitled to receive the amount of water necessary to grow crops up to one-eightieth of a cubic foot per second of time per acre. (*State v. Twin Falls Salmon River Land & Water Co.,* 30 Ida. 41, 166 Pac. 220; *Caldwell v. Twin Falls Salmon River Land & Water Co.,* 225 Fed. 584; *Twin Falls Salmon River Land & Water Co. v. Caldwell,* 242 Fed. 177, 155 C. C. A. 17; *State v. Twin Falls etc. Water Co.,* 30 Ida. 41, 166 Pac. 220; *Childs v. Neitzel,* 26 Ida. 116, 141 Pac. 238; *Continental & Com. T. & S. Bank v. McCarty,* 188 Fed. 273; *Christian v. First Nat. Bank,* 155 Fed. 705; *Mt. Vernon Ref. Co. v. Fred W. Wolfe Co.,* 188 Fed. 164; 13 C. J. 544; sec. 2948, C. S.)

The fact that there was a drought is no defense to this action. The contracts did not provide the drought would excuse defendant. (*The Northern Irr. Co. v. Watkins* (Tex. Civ.), 183 S. W. 431; 6 R. C. L. 997, par. 364; *Northern Irr. Co. v. Dodd* (Tex. Civ.), 162 S. W. 946; *Anderson v. Adams,* 43 Or. 621, 74 Pac. 215; *Berg v. Erickson,* 234 Fed. 817, L. R. A. 1917A, 648; *Trenton Public Schools v. Bennett,* 27 N. J. L. 513, 72 Am. Dec. 373; 13 C. J. 641; *Poradine v. Jane,* 82 Eng. Reprint, 897; *School District v. Dauchy,* 25 Conn. 530, 68 Am. Dec. 371; *Summers v. Hibbard,* 153 Ill. 102, 46 Am. St. 872, 38 N. E. 899; *Oakland Electric Co. v. Union Gas & E. Co.,* 107 Me. 279, 78 Atl. 288; *Middlesex Water Co. v. Knappmann Whiting Co.,* 64 N. J. L. 240, 81 Am. St. 467, 45 Atl. 692, 49 L. R. A. 572; *Jones v. United States,* 96 U. S. 24, 24 L. ed. 644; *Jacksonville M. P. R. Co. v. Hooper,* 160 U. S. 514, 16 Sup. Ct. 379, 40 L. ed. 515; *Meriweather v. Lowndes County,* 89 Ala. 362, 7 So. 198; *Hoy v. Holt,* 91 Pa. St. 88, 36 Am. Rep. 659.)

The plaintiff in preparing for the planting of crops in 1915 had a right to rely on the statements of the defendant's officers as to the water supply. A written contract can be modified by subsequent verbal agreement. (3 Elliott on Contracts, p. 6, par. 1861.)

It was error to inform the jury that the company was not liable for any statements made by defendant's officers to the plaintiffs because defendant was estopped by the representations of its agent. (*Groefsema v. Mountain Home Co-op. Irr. Co.*, 33 Ida. 86, 190 Pac. 356; *Hanes v. Idaho Irr. Co.*, 21 Ida. 512, 122 Pac. 859; 2 Kinney on Irrigation, p. 2033; *Arthur Irr. Co. v. Strayer*, 50 Colo. 371, 115 Pac. 724.)

Walters, Hodgin & Bailey and R. P. Parry, for Respondent.

The respondent in its capacity as controller of the operating company, during 1915, owed appellants as shareholders therein no other duty than to deliver to them their proportionate share of the available water, without negligence. (*Gerber v. Nampa & Meridian Irr. Dist.*, 16 Ida. 1, 100 Pac. 80; *Berg v. Yakima Val. Can. Co.*, 83 Wash. 451, 145 Pac. 619; *Young v. Extension Ditch Co.*, 28 Ida. 775, 156 Pac. 917; *Jackson v. Indian Creek etc. Co.*, 16 Ida. 430, 101 Pac. 814; *Stuart v. Davis*, 25 Colo. App. 568, 139 Pac. 577; *McNair v. Imperial Water Co. No. 8*, 155 Cal. 373, 103 Pac. 207; *Booth v. Chapman*, 59 Cal. 149; *San Joaquin & K. etc. Co. v. Stanislaus*, 191 Fed. 875; *Imperial Water Co. No. 5 v. Holabird*, 197 Fed. 4; *O'Connor v. North Truckee Ditch Co.*, 17 Nev. 245, 30 Pac. 882; *Rocky Ford Can. etc. Co. v. Simpson*, 5 Colo. App. 30, 36 Pac. 638; *Mountain Supply Ditch Co. v. Lindekugel*, 24 Colo. App. 100, 131 Pac. 789; *Lassen Irr. Co. v. Long*, 157 Cal. 94, 106 Pac. 409; sec. 5654, C. S.; *Twin Falls, Oakley etc. Co. v. Martens*, 271 Fed. 428; *Twin Falls Salmon etc. Co. v. Caldwell*, 225 Fed. 593.)

Appellants' contract rights could not be altered or enlarged by the casual conversation between one of the appellants and respondent's general manager. (6 R. C. L. 914,

916, cases cited; *W. T. Rawleigh v. Van Duyn,* 32 Ida. 767, 188 Pac. 945.)

The failure of the water supply occasioned solely by a drought on the watershed of the streams supplying respondent's project is a complete defense to this action. (6 R. C. L. 1005, and cases cited; 9 Cyc. 361; *Taylor v. Caldwell,* 3 Best & S. 826; 122 Eng. Reprint, 309; 6 Eng. Rul. Cas. 603; 12 A. L. R. 1275, 1276; *The Tornado (Ellis v. Atlantic Mutual Ins. Co.),* 108 U. S. 342, 2 Sup. Ct. 746, 27 L. ed. 747; *The Claveresk,* 264 Fed. 276; *J. S. Potts Drug Co. v. Benedict,* 156 Cal. 322, 104 Pac. 432; *Ontario etc. Growers' Assn. v. Cutting Fruit Packing Co.,* 134 Cal. 21, 66 Pac. 28; *Ward v. Vance,* 93 Pa. 499; Elliott on Contracts, sec. 1910; *Siegel, Cooper & Co. v. Eaton & Prince Co.,* 165 Ill. 550, 46 N. E. 449; *Bruce v. Indiana Gas Co.,* 46 Ind. App. 193, 92 N. E. 189; *Pengra v. Wheeler,* 24 Or. 532, 34 Pac. 354, 21 L. R. A. 726; *Hunter Canal Co. v. Robertson,* 113 La. 833, 37 So. 771.)

W. G. Bissell, *Amicus Curiae.*

DUNN, J.—This action was brought by appellants for damages for failure of respondent to furnish water during the season of 1915 for irrigating certain lands, owned by appellants, according to contracts existing between the parties to this action. Respondent is a corporation organized for the purpose of constructing an irrigation system and providing water for the reclamation of lands in Blaine and Lincoln counties under what is commonly known as the Carey Act, and appellants are holders of four contracts entered into between the respondent on the one hand and appellants and their predecessors in interest on the other. The case was tried before a jury and a verdict returned in favor of respondents. From the judgment entered upon said verdict this appeal was taken. Numerous errors are assigned by appellants but we think the case may be disposed of in this court by a determination of one question, or possibly two.

Five segregations of land have been made under the contract between the respondent and the state of Idaho numbered respectively 9, 10, 11, 12 and 22. The land contracts involved in this action were made under what is known as the first segregation, list No. 9; but it is conceded by both parties that the contracts entered into between respondent and the state of Idaho as to lists 9, 10, 11 and 12 and the individual contracts involved herein are to be considered and construed as one contract. Subsequent to the making of the contracts covering the lands embraced in lists 9, 10, 11 and 12 respondent entered into what is called a supplemental contract with regard to lands embraced in list No. 22. It is urged by appellants that the right of the respondent to distribute water to settlers on the lands embraced in list 22 on an equal footing with those upon lands embraced in the other four lists can be and ought to be adjudicated in this action. This question cannot be determined in this action for the reason that this issue is not presented by the pleadings herein, and for the further reason that if such issue were presented by the pleadings, not all of the parties necessary to a full determination of this question are before the court.

The sole question to be determined is whether respondent bound itself to deliver the specific amount of water set out in the contracts, viz., one-eightieth of a cubic foot of water per second per acre during the irrigating season, so that in case of its default in this regard it can be held to respond in damages. The contention of appellants is that the contracts must be so interpreted, while the contention of respondent is that respondent bound itself only to deliver to appellants their proportionate part of the water that could be supplied from its appropriation in Big Wood River and Malad River, so that in case of shortage in the supply due to drougth or to other natural causes its contract would be fulfilled if appellants received their fair proportion of the available water supply.

Respondent further contends that during the year 1919, when the alleged damage occurred, it was acting simply in the place of the holding and operating company, The Big

Wood River Reservoir and Canal Company, and that it had no responsibility with regard to the water supply except to equitably distribute it among the land owners. The contract between the respondent and the state of Idaho, entered into on the 8th day of May, 1907, which covered the lands embraced in list No. 9, contained the following provisions:

### "4. Appropriation of Water.

"It is understood that the party of the second part is the owner of a right to divert from the Big Wood River and Malad River 3000 cubic feet per second of time of water, under permit Number 1817, issued by the State Engineer of the State of Idaho, on the 16th day of November, 1905.

"And the said party of the second part agrees to furnish and deliver to the owners of shares in said reservoir and irrigation system, as specified in the other provisions of this contract, all of said appropriated waters to which the said second party may be entitled to the extent of one-eightieth (1/80) of one (1) cubic foot per second of time per acre, said water to be furnished for the reclamation of the lands included in said First Segregation, List Number 9, together with any other lands not included in said First Segregation, but which are so situated as to be susceptible of irrigation and reclamation from the canal and distribution system designed for the irrigation of the lands included in said List Number 9.

"And the said second party hereby covenants and agrees that it has not done, suffered or permitted on its part any act or thing by reason whereof the appropriation so made, of the water of Big Wood River and Malad River, for the purpose of the irrigation and reclamation of lands through the system of works to be constructed hereunder, has been or in the future may be in any way impeached, clouded or impaired. . . . .

### "6. Application for Lands.

"The said party of the first part, through its State Board of Land Commissioners, agrees that it will not approve any application for or filing on the lands herein referred to

as the First Segregation, List Number 9, until the person or persons so applying shall furnish to the said Board a true copy of the contract entered into with the party of the second part for the purchase of sufficient shares of water rights in said reservoir and irrigation system for the irrigation of said lands, said shares of water rights to be evidenced by the stock of the Big Wood River Reservoir & Canal Company, Limited, as hereinafter provided.

"The second party stipulates and agrees that to the extent of the capacity of the irrigation works and to the extent of its water rights, it will, as rapidly as lands are open for entry and settlement sell or contract to sell water rights or shares for land to be filed upon to qualified entrymen or purchasers without preference or partiality, other than that based upon priority of application; it being understood, however, that priority of application or priority of entry or settlement shall not give any priority of right to the use of water flowing through the canal as against subsequent purchasers, but shall entitle the purchaser to a proportionate interest only therein, the water rights having been taken for the benefit of the entire tract of land to be irrigated from the system. The priority of the application upon the opening days shall be determined by a system of drawing under the direction of the State Board of Land Commissioners. . . . .

"8. Price of Water Rights.

" . . . . But in no case shall water rights or shares be dedicated to any of the lands aforementioned or sold beyond the carrying capacity of said canal system or in excess of the appropriation of waters as hereinbefore mentioned. . . . .

"9. Transfer of Management and Possession of Canal.

"It being necessary to provide a convenient method of transferring the ownership and control of said canal from the said party of the second part herein to the purchasers of said water rights in said canal and for determining their rights among themselves and between said purchasers and

the party of the second part herein, for the purpose of operating and maintaining said canal during the period of construction and afterwards and for the purpose of levying and collecting tolls, charges and assessments for the carrying on and maintaining of said canal and the management and operation thereof, it is hereby provided that as soon as said lands are ordered thrown open for settlement, a corporation, to be known as the Big Wood River Reservoir & Canal Company, Limited, shall be formed at the expense of the party of the second part, the Articles of Incorporation of said Company to be in a form approved by the Attorney General of the State of Idaho; that the authorized capital stock of said corporation shall be One Hundred Twenty-five Thousand (125,000) shares, which amount is intended to represent one share for each acre of land which may hereafter be irrigated from said canal. The entire authorized amount of the capital stock of said corporation shall be delivered to the party of the second part herein in consideration of the covenants and agreements herein contained in order to enable it to deliver to purchasers of water rights the shares of stock representing the same. Said shares of stock, however, shall have no voting power and shall not have force and effect until they have been sold or contracted to be sold to purchasers of land under this irrigation system.

"At the time of the purchase of any water right there shall be issued to the purchaser thereof one share of the capital stock of said corporation for each acre of land entered or filed upon. That the said party of the second part herein shall, in · case said water rights or shares of stock are not fully paid for, require the indorsement and delivery to it of said stock, and shall at the same time, require of said purchaser an agreement that until thirty-five per cent (35%) of the purchase price of said stock has been paid the said party of the second part herein shall vote said stock in such manner as it may deem proper at all meetings of the stockholders of said corporation.

"But the said second party hereto nor the Big Wood River Reservoir & Canal Company, Limited, cannot in any manner control any of the said system so as to limit the

liability of the second party under the terms of this contract.

"The said Big Wood River Reservoir & Canal Company, Limited, shall have the management, ownership and control, as above set out, of the said irrigation system as fast as the same is completed and turned over to it for operation by the said party of the second part, as hereinafter provided. Whenever it is certified by the Chief Engineer of the Company and the State Engineer, that certain portions of the said irrigation system are completed for the purposes of operation, the same may, with the consent of the State Land Board, be turned over to the Big Wood River Reservoir & Canal Company, Limited, for operation. Such transfer and operation, however, shall not in any manner lessen the responsibility of the said second party with reference to the terms of this contract, . . . .

## "10. Water Right Dedicated.

"The certificates of shares of stock of the Big Wood River Reservoir & Canal Company, Limited, shall be made to indicate and define the interest thereby represented in the said system, to wit: A water right of one-eightieth (1/80) of a cubic foot per second for each acre and a proportionate interest in said reservoir and irrigation system, and shares based upon the number of shares ultimately sold therein. While the party of the second part shall retain control of said Big Wood River Reservoir & Canal Company, Limited, water shall be measured and be available for use within one-half mile of the place of intended use and in such quantities and at such times as the condition of the crops and weather may determine, but according to such rules and regulations, based upon a system of distribution of water to the irrigators in turn and by rotation, as will best protect and serve the interests of all the users of water from said irrigation system. It is agreed that said system of distribution by rotation shall be devised by the said party of the second part and used by the said Big Wood River Reservoir & Canal Company, Limited (in case the necessity arises), during the period while it retains the management

of said Big Wood River Reservoir & Canal Company, Limited, said system of rotation, however, to be approved by the State Engineer. The sale of the water rights to the purchaser shall be a dedication of the water to the lands to which the same is to be applied, such water right to be a part of and to relate to the water right belonging to said irrigation system.''

This contract also provided for the second, third and fourth segregations embracing lands in lists numbered 10, 11 and 12, respectively, and that a later contract should be entered into by respondent and the state of Idaho in substantially the same form as this contract, ''the said contract to be considered as one contract covering the entire reservoir and irrigation system of the Idaho Irrigation Company, Limited, as shown by the plans, maps and specifications of the said system on file in the State Engineer's office.''

On August 21, 1907, the said contract covering lists 10, 11 and 12 was entered into by respondent and the state of Idaho, being in substantially the same form as the former contract except that paragraph 12 thereof reads as follows:

''Said party of the second part agrees to continue to prosecute the work on said reservoir and irrigation system diligently and continuously to completion; and that there shall be no cessation of work thereon after the first year for more than sixty days without the consent of the Board; and to supply water to the lands included in the said List Number 9 on or before May 8th, 1908, and to the Lands included in Lists Numbers 10, 11 and 12 within two years from the date of this contract, and to complete the entire irrigation works within five years from this date, at which last-mentioned date the obligation to furnish the full one-eightieth (1/80) of a cubic foot per second of time of water per acre shall be in force and effect.''

The purchasers' contracts involved in this action were in the same form and contained the following provisions, after reciting the making of the contracts above referred to between respondent and the state:

''That the purchaser has made application to the company to be permitted to purchase upon the terms herein-

after set forth, the rights and privileges by said contract guaranteed, to the extent hereinafter named, which said application has been accepted by the company subject to the approval of the State Board of Land Commissioners, whose approval, previous to the delivery thereof, has been by its Register indorsed hereon;

"That in consideration of the sum of *Four Hundred Eighty ($480.00)* Dollars cash in hand paid this day by the purchaser to the company and in consideration of the covenants and agreements hereinafter contained, it is agreed that in pursuance of the contract between the company and the State, hereinafter called the State Contract, that the purchaser shall become entitled to—*160*—shares of the capital stock of the Big Wood River Reservoir and Canal Company, Limited, the certificate thereof to be in form as follows, to-wit:

## "BIG WOOD RIVER RESERVOIR AND CANAL COMPANY, LIMITED.

"—*160*—Shares.                    *August 12, 1907.*

"This is to certify W. J. Tapper is the owner of —*160*— shares of the capital stock of the Big Wood River Reservoir and Canal Company, Limited.

"This certificate entitles the owner thereof to receive one-eightieth of a cubic foot of water per acre per second of time for the following-described land: *NE. 4 in Sec. 23, T. 3 S., R. 19 E., B. M (unsurveyed)* in accordance with the terms of the contract between the State of Idaho and the Idaho Irrigation Company, Limited, and this certificate also entitles the owner to a proportionate interest in the dam, canal, reservoirs and water rights and all other rights and franchises of the Idaho Irrigation Company, Limited, based upon the number of shares finally sold, in accordance with the said contract between the said company and the State of Idaho.

"_____.

"By ————————————,

"Vice-President.

"Attest: ————————————,

"Secretary.

"Said certificate to be delivered as provided for in said State contract and under the conditions therein stated. . . . .

"And the parties hereto expressly agree as follows, to wit:

"1. This agreement is made in accordance with the provisions of said contract between the State of Idaho and the company, which together with the laws of the State of Idaho, under which this agreement is made, shall be regarded as defining the rights of the respective parties. And shall regulate the provisions of the shares of stock to be issued to the purchaser by the Big Wood River Reservoir and Canal Company, Limited."

In addition to the written contracts pleaded appellants alleged that on or about the 2d day of May, 1915, they informed respondent that they desired to seed a certain amount of land to tame grasses and that at said time they were advised by M. R. Kays, who was then the acting manager of the respondent, to do so; and that appellants, believing that respondent would furnish water according to its contract and relying upon it to do so, did sow said land to tame grass and cared for the same and irrigated it in a good and husbandlike manner so long as water was available during that season and that through the failure of respondent to comply with its contract to furnish one-eightieth of a cubic foot of water per second of time per acre during said irrigating season the said crop withered and died and became wholly valueless.

"The intention of the parties is to be deduced from the language employed by them, and the terms of the contract, where unambiguous, are conclusive, in the absence of averment and proof of mistake, the question being, not what intention existed in the minds of the parties, but what intention is expressed by the language used. When a written contract is clear and unequivocal, its meaning must be determined by its contents alone; and a meaning cannot be given it other than that expressed. Hence words cannot be read into a contract which import an intent wholly unexpressed when the contract was executed. Where the contract evidences care in its preparation, it will be presumed that its

words were employed deliberately and with intention.''
(13 C. J., p. 524, sec. 485.)

We are of opinion that a fair construction of the language
used by the parties in these contracts leads inevitably to the
conclusion that respondent bound itself to deliver the speci-
fied amount of water, namely, one-eightieth of a cubic foot
of water per second of time per acre during each irrigating
season. It must be borne in mind that the purpose of the
state and federal government in authorizing such an enter-
prise as was undertaken by respondent was to reclaim the
desert land embraced within the project. No contract could
be entered into with respondent until it had given assurance
that it had a supply of water sufficient to reclaim the land
covered by the project, and when it conveyed to the pur-
chasers by the contracts from which we have quoted it must
have had in mind that it was selling to the purchaser, to
the extent of one-eightieth of a cubic foot per second per
acre, an amount of water on which he could rely to reclaim
his land and enable him by proper methods of husbandry
to profitably grow crops on the same. The language used
in the contracts leaves no doubt that the respondent was
attempting to assure the purchaser that he would receive
the amount of water specified, nor can there be any doubt
that the purchaser was justified in such belief. To adopt
the view advanced by respondent that the purchaser's con-
tract was fulfilled when he received his proportion of what-
ever water supply was provided by respondent puts the
purchaser in the position of having purchased a bare chance
of a water supply rather than a right to a definite amount
of water as expressed in the contract. Such meaning is not
to be found in the language of the contracts. When the
contract recited that respondent had a water right of 3,000
cubic feet per second from which water was to be conveyed
within a certain distance of the purchaser's land; that re-
spondent agreed to furnish and deliver to the owners of shares
in the reservoir and irrigation system all of the appro-
priated water to the extent of one-eightieth of a cubic foot
of water per second per acre; that the certificates of shares
of stock in the Big Wood River Reservoir and Canal Com-

pany should define the interest thereby represented as a water right of one-eightieth of a cubic foot per second for each acre and a proportionate interest in said reservoir and irrigation system; that said certificates of shares as issued and delivered to appellants did so provide, and when said contract provided that at a certain date, which was prior to the time of the alleged default of respondent, "the obligation to furnish the full one-eightieth of a cubic foot per second of time of water per acre shall be in force and effect," we fail to see any escape from the conclusion that respondent voluntarily undertook to do each year during the irrigating season the very thing specified by the contract.

We are not without authority in the decisions of this court to sustain this view of the contract. In *State v. Twin Falls etc. Water Co.*, 30 Ida. 77, 166 Pac. 32, on rehearing, the court was discussing a similar provision of the contract between the parties by which it was provided in language substantially identical with that used in this case that the purchasers should be entitled to a water right of one-hundredth of a cubic foot per second per acre, and a proportionate interest in the canal and irrigation works, based upon the number of shares ultimately sold therein, and speaking of the contention of the company in that case, which was identical with that made by respondent in this case, the court said:

"It would be an unwarranted construction to hold that by reference to the contract between the state and the Construction Company all that was intended was to state that the owner of the certificate of stock in the Salmon River Canal Company, Ltd., should be entitled only to his proportionate interest in the canals, water rights, etc., of the company based upon the number of shares finally sold to settlers. If carried to its ultimate conclusion, by such construction the settler might be deprived of any water right whatever."

In the case of *Childs v. Neitzel*, 26 Ida. 116, 141 Pac. 77, this court was considering a contract substantially the same as this one. In that case the water company had failed to complete its water system and supply water to settlers

according to its contract. It had mortgaged its entire irrigation and water system to Neitzel for $150,000 and had also assigned to him the settlers' contracts upon which there was still due about $100,000. Neitzel was attempting to collect the balance due on these contracts and apply it on his mortgage. The settlers and water users intervened in said action and attempted to have applied on the uncompleted irrigation system the balance due upon their contracts. From a judgment in behalf of the intervenors Neitzel appealed. His counsel contended in this court that the irrigation company was the mere instrument or legal means for providing the lands with water, the cost thereof to be paid by the landowners or purchasers of water under said contract. In discussing this contention and the duty of the water company under its contract with the water purchasers this court said:

"We cannot agree with counsel in that contention. The Murphy company agreed to complete said irrigation system with its dams, reservoirs and canals and turn the same over to the purchasers of water rights within a specified time, the price per acre for such water rights being stipulated in most of the contracts at $35 per acre. The Murphy company no doubt contemplated making a considerable profit for itself in the construction of said system. It was not an eleemosynary corporation or the trustee or agent of the water right purchaser for the construction of said irrigation system, but was a corporation organized for the purpose of making a profit to its stockholders from the construction of said system. If any profits had arisen to the company from the construction of said system, the purchasers of said water rights could not, under said contracts, share in them with the Murphy company. The Murphy company had employed engineers and experts to examine said irrigation project as to its feasibility, the quantity of water that could be obtained for the irrigation of said land and the cost of the construction of said system to make the water available to the land to be irrigated, and after that was done, an estimate was made of the amount to be charged for each acre water right that would be necessary and sufficient to con-

struct said system and pay a good profit to the Murphy Company. Under said water contracts it was not expected, contemplated or necessary for the purchasers of water rights to employ engineers and other experts to make a proper estimate of the amount of water obtainable and the cost of the construction of the system, and to ascertain whether the company could place the water at feasible points near the land to be irrigated. That had been done by the Murphy company, and it sold water rights upon the representations that it had water sufficient to furnish each purchaser with the amount called for in his water contract, and also was able to construct said system and complete it. Hence the purchasers of water rights under such system had a legal right to depend upon the estimates made by the irrigation company and upon their contracts with it to the effect that the company would finish and complete the system and furnish the water according to the terms of the contract. They did not purchase under the rule *caveat emptor.*''

It is true, as stated by respondent, that the Neitzel case did not involve a Carey Act contract, but no reason is found in that fact for holding that the language of the contract in that case has any different meaning from what such language would have in a Carey Act contract. The statements made by this court in the Neitzel case aptly describe the situation in the case at bar. Undoubtedly respondent before entering into the contracts by which it sold water rights to appellants and other settlers made a thorough investigation into the water supply upon which it was to rely in fulfilling its contract. Undoubtedly it made such an exhaustive investigation as to feel warranted in representing that it had a water supply of three thousand cubic feet per second. Such an investigation was utterly impossible for the individual purchasers and they had a right to rely upon the representation of respondent that it had such a water supply and would deliver to them annually the amount of water specified in their contracts.

In discussing a similar Carey Act contract Judge Dietrich in the case of *Caldwell et al. v. Twin Falls Salmon River Land & Water Co.*, 225 Fed. 591, said:

"The import of the instrument, standing alone, as it would be understood by an intelligent layman with no preconceived notions of its meaning, is not open to debate. It is a contract for the sale of a specific water right of one-hundredth of a second foot per acre for each acre of land described, and as an incident thereto a proportionate interest in the irrigation system. The holder of a certificate of stock, so the contract reads, is entitled 'to receive one-hundredth of a cubic foot of water per acre' and 'a proportionate interest in the dam, canal, water rights, etc.' The defendant's contention wholly ignores the first of these co-ordinate clauses and limits the right granted precisely to the second, but the clauses are neither inconsistent with each other nor identical in meaning and no reason is apparent why they should not both be given effect."

This view was approved by the circuit court of appeals of the ninth circuit in the same case. (*Twin Falls Salmon River Land & Water Co. v. Caldwell,* 242 Fed. 177, 193, 155 C. C. A. 17.)

Among the several defenses pleaded by respondent was an extraordinary drought during the year 1915. Nowhere in the contract mentioned is any exemption from liability claimed by respondent in case of drought. It is an unqualified undertaking to furnish the definite amount of water mentioned, and the right of the purchaser to receive it is conditioned only upon his complying with his contract. Such contracts sometimes contain such an exemption, as in the case of *Groefsema v. Mountain Home Co-operative Irr. Co.,* 33 Ida. 90, 190 Pac. 356. In that contract the irrigation company had this saving provision:

"In case of shortage of water in the Company's reservoir or canal system through an accident, drought, or scarcity in any natural stream supplying said canal, or by reason of improper diversion of water by any person, or from any cause beyond its control, the company shall not be liable for such shortage, nor for any damage caused thereby, nor shall there be, by reason thereof, any deduction from any sum agreed to be paid to the company by the purchaser."

The fact that no such exemption from liability was placed in the contract by respondent when it might easily have done so would lead fairly to the conclusion that respondent, with the water supply that it claimed, was willing to take the chances involved in making an unqualified contract to deliver the specified amount of water mentioned each year. In the leading case of *Taylor v. Caldwell,* 3 B. & S. 826, 833, cited by respondent, Blackburn, J., said: ''Where there is a positive contract to do a thing, not in itself unlawful, the contractor must perform it or pay damages for not doing it, although in consequence of unforeseen accidents the performance of his contract has become unexpectedly burdensome, or even impossible.''

We understand this to be the rule applicable to such contracts as are involved in the case at bar. It is supported by many authorities, among which are: *Rowe et al. v. Inhabitants of Peabody,* 207 Mass. 226, 93 N. E. 604; *Berg v. Erickson,* 234 Fed. 817, 114 C. C. A. 415, L. R. A. 1917A, 648; *The Harriman v. Emerick,* 9 Wall. 161, 19 L. ed. 629; *Jones v. United States,* 96 U. S. 24, 24 L. ed. 644; *Jacksonville etc. Ry. Co. v. Hooper et al.,* 160 U. S. 514, 16 Sup. Ct. 379, 40 L. ed. 515; *N. P. Ry. Co. v. American Trading Co.,* 195 U. S. 439, 25 Sup. Ct. 84, 49 L. ed. 269; *Middlesex Water Co. v. Knappmann Whiting Co.,* 64 N. J. L. 240, 81 Am. St. 467, 45 Atl. 692, 49 L. R. A. 572; 13 C. J. 641; 6 R. C. L. 364. The drought of 1915 did not excuse respondent from its obligation to supply appellants with the contract amount of water nor relieve it from liability to pay damages for its default in this respect.

Respondent attempts to bring itself within the rule applicable to a contract which shows upon its face that the parties had in contemplation that the fulfilment of the contract should depend upon the existence of a particular person or thing at the time fixed for fulfilment. This contention is without merit. There was in this case a contract to supply a certain amount of water for irrigation. While the contract mentioned the fact that the water would be taken from certain streams, the obligation to supply the water would have remained even if the supply from said streams had

totally failed. In order to obtain the contract with the state, respondent had to give assurance of its ability to supply water to settlers in sufficient quantity to reclaim their lands and in this way necessarily stated the source and amount of its water supply. There was no special virtue in the waters of Big Wood River or Malad River that made the fulfilment of the contract depend upon the continued existence of the supply from these streams, or that would have excused either party to the contract from performance on the ground of shortage in said streams.

Respondent attempts to limit its liability to that of the holding and operating company whose duty with regard to water extended no further than to fairly distribute the supply available among the respective users. This contention cannot prevail for the reason that the contract imposes upon it obligations entirely outside those of the holding and operating company. The fact that under the contract it had the duty of temporarily controlling the operating company could not have the effect of excusing it from the performance of the obligations of the contract entirely outside of and beyond those of the operating company. Besides, the contract contains this provision: "But the second party hereto nor the Big Wood River Reservoir and Canal Company, Limited, cannot in any manner control any of the said system so as to limit the liability of the second party under the terms of this contract."

We are of opinion that the conversation pleaded by appellants with respondent's manager, M. R. Kays, if considered in connection with the written contract, adds nothing to the force thereof. If it be considered as an attempt to show an independent contract binding on respondent, it is insufficient for the reason that no consideration therefor is shown.

The views herein expressed render it unnecessary to discuss at length the errors assigned by appellants. The drought pleaded by respondent constitutes no defense to the action and the element of negligence does not enter into it. The shortage of water for the year 1915 is admitted, and if the case is tried again there remains nothing for the

court and jury to do but to hear evidence as to the damages suffered and fix the amount thereof. The trial court will thus have no difficulty on a second trial in avoiding the errors complained of.

The judgment is reversed, with costs to appellants.

Budge, J., concurs.

RICE, C. J., Concurring.—I concur in the result. I place my concurrence upon the provision contained in the state contract as follows: "While the party of the second part shall retain control of said Big Wood River Reservoir & Canal Company, Limited, water shall be measured and be available for use within one-half mile of the place of intended use and in such quantities and at such times as the condition of the crops and weather may determine. . . . . " By this provision I think respondent agreed to perform a definite service, for a breach of which it is liable in damages.

I have not been able to reach the conclusion, suggested by the opinion of Justice Dunn, that an action such as the one at bar would lie against respondent, for failure to deliver water, after the control of the operating company passed to the land owners under the system. By the contracts in evidence, the construction company undertook to sell to the entrymen a definite water right. If there has been a breach of that contract, I am inclined to the view that damages therefor must be recovered in a single appropriate action for that purpose.

McCarthy, J., concurs in the concurring opinion.

36 Idaho.—7

(November 6, 1922.)

ON REHEARING.

CAREY ACT CONTRACTS—CONTRACTS BASED ON EXISTENCE OF SUBJECT MATTER—DAMAGES TO CROPS.

  1.   An action will lie for damages to crops under a Carey Act contract during the years in which the construction company retains control of the operating company, where the construction company has bound itself during such years to deliver water in such quantity as the condition of the crops and the weather shall determine.

  2.   *Held,* that the contracts involved in this action absolutely guaranteed an adequate supply of water to fulfil the contracts during ordinary or average seasons; but a diminution of the water supply, on account of an extraordinary drought, is a legitimate defense.

  RICE, C. J.—There can be no doubt that an action for damages to crops, because of failure to deliver water during the years in which the construction company retained control of the operating company, will lie, since during those years the construction company bound itself to deliver water in such quantity as the condition of the crops and the weather might determine. (*Hanes v. Idaho Irr. Co.,* 21 Ida. 512, 122 Pac. 859.) I think, however, that the principle that the performance of the contract was based upon the continued existence of the subject matter is at least partially applicable. (*Dow v. Bryant,* 28 Wyo. 508, 206 Pac. 1061; *Hanes v. Idaho Irr. Co., supra.*)

  An examination of all the contracts can leave no doubt that the construction company absolutely guaranteed an adequate water supply during ordinary or average seasons; but a diminution of the water supply on account of an extraordinary drought should be held to be a legitimate defense. The fact that the canals were taken from a reservoir constructed in and about the bed of the river which constantly flowed into it does not affect the validity of this defense. Under such circumstances the reservoir could not be held to be a private receptacle so as to make the

water impounded therein a mere matter of merchandise. Neither was it contemplated or agreed that respondent should hold in its reservoir at the close of any year water to supply a shortage for a succeeding year.

With such issues presented, the appellants made a *prima facie* case by proving the contract and failure to deliver water in accordance with its terms and consequent damages to their crops together with the amount thereof. It was incumbent upon respondent to prove the failure of the water supply on account of an extraordinary drought, and also that it delivered to appellants their just proportion of the water supply which it had. The determination of the issues in this case does not require the presence of additional parties. Any judgment rendered is binding only between the parties to the suit.

The court instructed the jury that before the plaintiffs can recover a judgment against the defendant it is incumbent upon them to prove that the defendant company had a water supply which was available to the defendant for distribution to plaintiffs, and that the defendant failed and neglected so to distribute to the plaintiffs' injury. This instruction was error; it shifted the burden of proof. For this error the judgment should be reversed.

I adhere to the views expressed in my former concurring opinion, that an action for damages to crops will not lie against respondent after it ceased to retain control of the operating company. Judgment is reversed. Costs to appellant.

McCarthy, J., concurs.

Budge, J., concurs in the conclusion reached.

DUNN, J.—I adhere to the views expressed in the original opinion. The rule that "where the performance of a contract depends upon the continued existence of a person or thing which is assumed as the basis of the agreement, the death of the person, or the destruction of the thing terminates the obligation," has no application where the thing

destroyed is the thing which one of the parties has expressly contracted to produce and deliver. (*Logan v. Consolidated Gas Co.,* 107 App. Div. 384, 95 N. Y. Supp. 163; *Vogt v. Hecker,* 118 Wis. 306, 95 N. W. 90; *John Soley & Sons v. Jones,* 208 Mass. 561, 95 N. E. 84; 13 C. J., p. 644, sec. 718.)

*Dow v. Bryant,* 28 Wyo. 508, 206 Pac. 1061, I think is not in point in this case. There a lease of certain land for one year was made together with sufficient water from the Lewis extension of the R. Bahr canal to irrigate the same, and on the trial the lessee, who claimed damages for failure to furnish sufficient water, testified that he had known the land for eighteen years or more and the source from which the water for its irrigation was obtained; that water could not be obtained elsewhere, and that he had told the lessor before the lease was signed that he thought there would be a shortage of water. It was also shown that the lessor had received $650 for the lease of the land from another party and she testified that on account of the probable shortage of water and in consideration of the lessee's doing certain ditch work she reduced the price to $500.

In this case there is an entire absence of anything to indicate that the purchaser was aware of any condition that might make it impossible for the construction company to furnish in any year the full amount of water specified in the contract. If, as respondent now claims, it knew there would be occasional seasons of extraordinary drought in which it could not supply the amount of water required by its contract, it should have written therein an exemption from liability for damages from such cause. Not having done so, it should be held to the contract as written.

LEE, J., Specially Concurring.—Respondent is what is known as a Carey construction company, and entered into a contract with the state to construct an irrigation system to reclaim certain lands segregated by the United States to the state under the act of Congress approved August 18, 1894, and the acts supplementary and amendatory thereto. Thereafter respondent conveyed to appellants or their predecessors in interest, who are Carey entrymen, a right to the use

of certain of the public waters of the state, which it had appropriated for the settlers under the segregation, and it agreed to construct the ditches, canals and reservoirs and other necessary diverting works to deliver such water within one-half mile of the place of intended use by entrymen, and to supervise the delivery of the water to the users thereof for five years. This contract with the entryman also conveyed to him as tenant in common with all other users a proportionate interest in such diverting works, and they were at the expiration of that time to take over and operate the same for the delivery of said water.

During the year of 1915, and while respondent company was still in charge of said system and the delivery of water, but after the expiration of the time fixed in the contract for turning it over to the settlers, appellants put in certain crops that were dependent for their proper growth, cultivation and maturity upon receiving the maximum amount of water stipulated in the agreement. Appellants allege that they were not furnished with this amount of water, and that as a consequence there was a partial failure of their crops, by reason of which they sustained damages, for which they pray judgment.

Respondent seeks to avoid liability principally upon the ground that during the year of 1915 there was an unusual shortage of water in the watershed of the Big and Little Wood Rivers, from which the water supply of this system is obtained, and that owing to such shortage, due entirely to natural causes, respondent had pursuant to the terms of the agreement delivered to the lands of appellant, and to all other lands in said project, less than the maximum, but the full proportionate share of the available water supply to which said lands were entitled. No claim is made, as I understand, that this damage for a failure to deliver the full amount of water was because of negligence on the part of respondent, otherwise than by reason of its failure to conserve and have under its appropriation a sufficient amount of water to furnish the maximum of one-eightieth of a cubic foot per second of time during a low-water period. Appel-

lants contend that it was respondent's duty under this agreement to furnish the maximum amount, when such amount was necessary for the proper growth of their crops. Respondent takes the position that under the agreement it was only bound to furnish the maximum amount called for by said contract, provided the same was available in the natural sources from which said water supply was obtained.

The cause was tried by the court with a jury, which found for respondent company, and the cause is on appeal to this court from the judgment below. Appellants assign many errors, but I think the controlling question presented by the record is whether a shortage of water due to natural causes —that is, insufficient rain and snowfall—is a defense to an action by an entryman for damage to his growing crops by reason of a failure to furnish a sufficient amount of water, up to the maximum called for by the agreement, and what is the true measure of damages for such failure.

The contract between the entryman and the construction company must be construed not only with reference to its terms and the contract between the state and the company, but also in accordance with the state and federal law which has given rise to this class of agreements. Carey projects in this and adjoining arid states have been so numerous that the general plan of operation under the law for the reclamation of lands is well understood. A clear exposition of both the state and federal acts, and a construction of some of the provisions of this particular contract under consideration, is found in *Hanes v. Idaho Irr. Co.*, 21 Ida. 512, 122 Pac. 859. Many of these projects have been successful, and of inestimable value to both the state and the settlers under them, and large areas of land have been reclaimed and caused to be made highly productive which otherwise would have remained in an arid condition. The creation of the system and visualizing it into a practical plan required the exercise of a high order of constructive ability. Necessarily, it was something of an experiment, and that errors would be made was inevitable. Some of these have resulted in serious loss to settlers under certain of these projects, and

few, if any of them, have been profitable to the promoters. In the nature of things, the success of these reclamation projects was in a large degree dependent upon estimates, for the reason that in their inception, accurate data was not obtainable as to the dependable character of the water supply, commonly termed the "run-off" of the watershed that was to supply water to such projects. Experience has demonstrated that in almost every instance the estimate of the water supply available for the reclamation of a particular tract was too high for the occasional low-water season or drought period, which every rational person knows is possible and liable to happen in this region. Public officers charged with the duty of making these contracts with construction companies were confronted with this situation: If they limited the sale of land under a Carey segregation to the amount of water that would be available in a year of extreme drought or low-water season, a vast amount of equally good land, and for which there was an ample supply of water under normal conditions, would have to remain in its desert state, and the cost of reclaiming the lands sold would be greatly increased to the purchaser and the surplus water during an average year would be lost. These considerations may have influenced allowing in some instances lands to be filed upon where there was not an adequate supply of water, which has entailed upon the settler a hardship that should have been avoided. It has frequently given rise to litigation, and caused much of the segregated land to be returned to the government for settlement under other of the public land laws. It is clear that entries upon these segregated lands should have been so limited that construction companies could not sell water contracts for lands in excess of the amount of water which would be available for delivery during the average ordinary year.

The question here presented is, has respondent by its contract obligated itself to furnish the maximum amount of water called for, when there has been a shortage of the available water supply caused by a lack of precipitation in the watershed supplying this system, and if the construction

company is liable for such shortage, what is the proper measure of damages?

In the instant case, appellants contend—at least, that is the logical sequence of their position—that the measure of damages should be the difference between the value of the crops that would have been produced with a full supply of water, and that which was actually produced under the diminished supply, and that this liability is a continuing one, for which the settler will have a new cause of action upon every recurrence of the shortage. Manifestly, if this be a correct rule of law applicable to this class of contracts, it is not only conceivable, but almost a fixed certainty, that a construction company may be liable for an amount of damages in excess of the original sale price of the water right. It is suggested that construction companies of this character might have easily protected themselves against such a contingency by inserting a provision holding them harmless in case of an abnormal shortage of precipitation, but that if they have failed to expressly limit their liability, they are without remedy, because these contracts make them liable for a delivery of the maximum amount whenever the same is needed, and that a shortage of the available water supply, although it be due to a drought of extraordinary severity, is no defense. Respondent claims that there has been no breach of the contract, that its liability is limited to furnishing the maximum amount of water stipulated in the contract only under average normal conditions, and that in the absence of any fraudulent representations as to such water supply, a shortage of water available, caused by an extreme drought, such as is alleged to have occurred in 1915, is a complete defense to the cause of action set forth in the complaint. Respondent also contends that a proper construction of this agreement brings it within the rule stated in *Taylor v. Caldwell*, 3 Best & S. 826, 122 Eng. Repr. (K. D. B., Book 51) 309, that where from the nature of the contract it appears that the parties must from the beginning have known that it could not be fulfilled unless when the time came for the fulfilment of the contract the particular specified thing continued to exist, so that when entering into the

contract, they must have contemplated such existence as the foundation of what was to be done; that in the absence of any express or implied warranty that the thing shall exist, the contract is not to be construed as a positive contract, but as subject to an implied condition that the parties will be excused in case, before breach, performance becomes impossible from the perishing of the thing, without fault of the contractor.

Respondent further contends that even if it has failed to supply the maximum amount specified in the agreement, the measure of damages caused by such failure is not the loss of crops in any one low-water year or succeeding number of low-water years, but such damage is to be determined by the difference between the purchase price paid by the settler for such water right, and its diminished value by reason of such right being insufficient to supply the maximum during low-water years, the question being analogous to that presented by an action for a breach of a covenant of warranty in a deed, and that in no event can the grantor be liable in an amount in excess of the original purchase price, plus accrued interest and such costs and other damages as are directly incident to a breach of warranty, and that neither speculative damages in the way of anticipated profits nor enhanced value can be taken into account in computing such damages.

That rule is stated by Chief Justice De Grey in *Flureau v. Thornhill*, 2 W. Bl. 1078: "Upon a contract for a purchase, if the title proves bad and the vendor is (without fraud) incapable of making a good one, I do not think that the purchaser can be entitled to any damages for the fancied goodness of the bargain which he supposes he has lost." To which Justice Blackstone added: "These contracts are merely upon condition, frequently expressed but always implied, that the vendor has good title. If he has not, the return of the deposit, with interest and the costs, is all that can be expected."

While this doctrine has been criticised as being an exception to the rule of law that a vendor who from whatever cause fails to perform his contract is bound to place the purchaser, so far as money will do so, in the position he would

have been in if the contract had been performed, yet it has received the sanction of the great majority of the English courts, as being an exception that is founded in common justice and right, and is acknowledged to be the English rule to-day. The principal criticism is that the rule is too broad, and does not distinguish between cases where the vendor has contracted under an honest belief that he had title, and where he contracted with a view of obtaining title for the purpose of conveying it, and failed to so obtain title. In this latter class of cases it has been modified by some of the courts. An extensive review of the authorities may be found in *Morgan v. Bell*, 3 Wash. 554, 28 Pac. 925, 16 L. R. A. 614, where the rule as thus stated is applied and followed.

In *Staats v. Ten Eyck's Exrs.*, 3 Caines (N. Y.), 111, 2 Am. Dec. 254, which is regarded as a leading case in this country, Kent, C. J., announces the rule to be: "In an action for a breach of covenants of seisin and quiet enjoyment, the measure of damages in case of eviction is the value of the land at the time of sale, represented by the consideration paid, with interest thereon from the time the plaintiff loses the mesne profits."

The great weight of authority, both ancient and modern, sustains this rule, that is, where the vendor has acted in good faith, without fraud, but is incapable of making a good title, the recovery of the purchaser cannot exceed the value of the land at the time of the sale, represented by the consideration paid, with interest thereon from the time that plaintiff lost the mesne profits. I see no reason why this rule is not applicable to a contract for the sale of water right of the character here described. C. S., sec. 3018, provides that the water right to all lands acquired under the provisions of chapter 136, commonly known as the Carey Act, shall attach to and become appurtenant to the land as soon as title passes from the United States to the state. While in *Bennett v. Twin Falls North Side etc. Co.*, 27 Ida. 643, 150 Pac. 336, it is held that this statute does not make the water right an inseparable appurtenance to the land, nevertheless such a right has all the attributes of real estate,

and the right of the entryman granted by the state by virtue of its agreement with the United States, to the particular land to which this water right is appurtenant, in effect constitutes a purchase of realty, although the title to the land is deraigned from the government, and the water right is acquired from the state.

In the majority opinion it is said that: "The principle that the performance of the contract was based upon the continuance of the subject matter is at least partially applicable," citing *Dow v. Bryant,* 28 Wyo. 508, 206 Pac. 1061, and *Hanes v. Idaho Irr. Co., supra.* The cause was submitted to the jury upon instructions to the effect that a shortage of water during the year of 1915, due to a scarcity of the natural supply, was a defense, and the majority opinion holds that: "A diminution of the water supply on account of an extraordinary drought should be held to be a legitimate defense."

The evidence offered by respondent that the year of 1915 was one of extraordinary drought was not seriously controverted by appellants, and in view of the cause being remanded for a retrial, the court below should not be left in doubt as to what this court intends to hold with regard to the liability of respondent under these contracts.

I think the cause should be remanded, with instructions that if necessary the parties be allowed to amend their pleadings, and that if it appears that respondent has failed to supply the maximum amount of water specified in the agreement, the measure of damages caused by such failure, when due to an extraordinary drought, is not the loss of crops in any one low-water year or number of low-water years, but such damage is to be determined by the difference between the purchase price paid by the settler for such water right, and its diminished value by reason of such right being insufficient to supply the maximum during low-water years. Because of entertaining these views, I have extended this concurrence with the majority opinion beyond what would otherwise be justifiable.